ERNESTO FERNANDO SCHLÜTER, demandante, apelante y apelado, v. ABOY VIDAL & Co., INC.; FINLAY, WAYMOUTH & LEE, INC., y ENRIQUE VIDAL SÁNCHEZ, demandados, apelados y apelantes.

· No. 5865.—*Sometido:* Febrero 26, 1935. *Resuelto:* Marzo 31, 1936.

*Hugh R. Francis,* abogado del Sr. Schlüter, apelante y apelado; *Henry G. Molina,* abogado de Aboy Vidal & Co., Inc.; y *C. J. Torres Laborde,* abogado de Finlay, Waymouth & Lee, Inc., y de E. Vidal Sánchez, demandados, apelados y apelantes.

EL JUEZ ASOCIADO SEÑOR WOLF, emitió la opinión del tribunal.

Los demandados y apelados en este caso lo son Aboy Vidal & Co., Inc., Finlay, Waymouth & Lee, Inc., y Enrique Vidal Sánchez. Vendieron cierto edificio de concreto que se había utilizado o se utilizaba como almacén, a Ernesto Fernando Schlüter, aquí demandante. El terreno en que estaba construído el edificio pertenecía a El Pueblo de Puerto Rico y fué cedido en arrendamiento a los demandados por un largo período de tiempo que expiraba en 1949. Se acepta que la propiedad fué vendida por $26,000, incluyendo el derecho de arrendamiento, y el precio pagado fué distribuído entre los varios demandados. El demandante tomó posesión de la finca y trató de almacenar allí un embarque de abono. Puso éste en el suelo, el agua se filtró de abajo para arriba y se dañó gran parte del material. El demandante introdujo

prueba tendente a demostrar que esta filtración era más o menos corriente durante fuertes lluvias y que el agua, podría decirse, manaba de la tierra. Por otra parte, el edificio está definitivamente situado en la "Marina", en la parte baja de la colina en que radica el Capitolio. Luego de sufrir esta pérdida, el demandante inició pleito contra los demandados solicitando se le devolviera parte del precio y se le indemnizara por los daños causados al abono. Si la causa de acción del demandante en su totalidad hubiera prevalecido, él habría recibido la suma de $13,000 por la supervaloración del edificio y $12,197 por los daños ocasionados al abono. De la opinión emitida por la corte después de celebrado el juicio, copiamos lo siguiente:

"Por el resultado de la prueba la corte estima demostrado que allá en el año de 1925, siendo los demandados dueños en común y proindiviso del edificio de concreto y de una sola planta a que se refiere la demanda, y deseándolo comprar el demandante, lo hizo examinar por los peritos ingenieros Manuel L. Miró y Francisco Pons; que el edificio solamente fué valorado en $24,000 y que se hizo un presupuesto de gastos de reparaciones, entre ellas el piso y techo, por la suma de $3,081.90; que el demandante entró luego en negociaciones separadamente con cada uno de los condueños para la compra del edificio . . . ."

La corte entonces revisa las condiciones de la compraventa y continúa diciendo:

"Se ha demostrado que los terrenos de El Terraplén, son ganados al mar, o sea que fueron rellenados; que el terreno en que está enclavado el edificio está más bajo del nivel de las calles Carretera Nueva y terminación Pershing, con las que colinda por sus lados Norte y Este, respectivamente; que los terrenos del Paseo de Covadonga, del fuerte de San Cristóbal y el Capitolio, de San Juan, están asimismo en plano superior que los del Terraplén; que en marzo 27, 1924, se desarrolló en el edificio un incendio, y quedó sin ocupar desde marzo a noviembre 1924; y que cuando el demandante lo adquirió en mayo de 1925, el techo estaba en mal estado y por él penetraba el agua en épocas de lluvia, y además ya existía desde hacía algún tiempo el hundimiento del piso, a causa de una gran cantidad de

cemento que allí se almacenó, y porque el terreno, según parece, no estaba lo suficientemente consolidado y estable.

"Se estima asimismo demostrado que el edificio vendido no fué materialmente ocupado por el demandante hasta el 23 de junio de 1925, después de haberse sacado del mismo por los demandados los materiales y objetos que allí tenían, entre ellos un cemento propiedad de Enrique Vidal Sánchez; que el demandante almacenó en el edificio una gran cantidad de sacos de abono, y allá en agosto de 1925, hubo una fuerte lluvia y el agua filtró de abajo para arriba, inundándose el piso, y se dañaron unos 1854 sacos de abono que allí se encontraban, y que tenían un valor de $10,197; y que con posterioridad allá en el mes de octubre 1925, llegó a Puerto Rico por vapor Glendola otro cargamento de abono para el demandante, consistente en 32,000 sacos que no pudo guardarlos en el edificio y que pagó $1,913.94 por almacenaje a F. Benítez Rexach y a la Bull Insular Line, Inc."

Luego de revisar algunos de los hechos, la corte sigue diciendo:

"Es de conocimiento general que en las épocas de lluvia el nivel de las aguas subterráneas sube y baja de acuerdo con las condiciones de drenaje del terreno y también por las altas y bajas de las mareas, y estando el terreno donde se halla enclavado el edificio muy cerca al mar, pues fué ganado a éste mediante relleno, y más bajo que el Paseo de Covadonga y las Calles Carretera Nueva y Pershing, el agua pudo filtrar, según declaró el ingeniero Fossas, por el sitio más bajo y débil cual era el lugar por donde el piso estaba hundido y agrietado. Y también, según declaró el ingeniero Earle K. Burton, la filtración podría provenir de la falta de drenaje en el callejón que existe entre el edificio del demandante y el contiguo de Rolán & Tejedor, debido a que en este último no había canales que recogieran las aguas del techo. Los peritos han declarado que este estado de cosas desaparecerá tan pronto se arregle el piso convenientemente y se restablezca al nivel original, garantizando el ingeniero Sr. Francisco Pons, cuya capacidad e integridad se reconoce, hacer el trabajo por la suma de $4,000 a $4,500."

La corte llegó a la conclusión de que si bien era cierto que un lego de ordinario no podría sospechar tal condición en el suelo y en el subsuelo, que si el piso no fué construído

en debida forma en relación con las condiciones físicas, esto no era un defecto oculto. La corte había citado previamente los artículos 1387 y siguientes del Código Civil (Compilación de 1911).

Convenimos con el apelante en que si la condición expuesta equivalía a un defecto oculto, el demandante hubiera tenido derecho a algo. Sin embargo, el apelante no nos convence de que el estado del piso al permitir la filtración de aguas sea un defecto oculto. Esto como cuestión de derecho.

La corte también basó su decisión, en parte, en el hecho de que el demandante Schlüter, antes de adquirir la propiedad, la hizo examinar por peritos ingenieros. La prueba tendió a demostrar que por otra parte el edificio no estaba en las mejores condiciones y que este hecho era conocido por el demandante y sus expertos.

Hay otro punto muy importante en el caso, y es que uno de los demandados había almacenado cemento en el edificio y dió por sentado que el mismo debía ser puesto en tablones sobre el piso. Según entendemos, ésta era una precaución corriente.

Naturalmente, si no existía defecto oculto o si el demandante o sus peritos tuvieron toda oportunidad para cerciorarse del estado del edificio, no habría causa de acción por los daños sufridos por el abono.

El apelante insiste en su alegato en que los demandados estaban obligados a saber el estado del edificio. Esto puede o no ser cierto. Dudamos que se probara conocimiento material por parte de ellos. No se imputó fraude, y, a nuestro juicio, debe resolverse que el demandante, o compró con sus ojos abiertos, o tuvo la oportunidad de comprobar fácilmente el estado real del edificio.

Los demandados también apelaron de la sentencia por haber dejado la corte inferior de imponer las costas al demandante. Aunque no dejamos de tener algunas dudas, los

demandados no nos convencen de que dicha corte cometió un abuso de discreción a este respecto.

*Debe confirmarse la sentencia apelada.*

El Juez Asociado Señor Travieso no intervino.