GERALD L. BOYD, ETC., ET ALS., demandantes y recurridos, *v.* CHARLES MIHULKA ET ALS., demandados y recurrentes; CHARLES MIHULKA y SU ESPOSA MILDRED MIHULKA, peticionarios, *v.* TRIBUNAL SUPERIOR DE PUERTO RICO, SALA DE SAN JUAN, HON. MANUEL A. MOREDA, JUEZ, demandado; GERALD L. BOYD Y SU ESPOSA CATHERINE C. DE BOYD, interventora.

*Números*: R-67-80,     *Resueltos*: 21 de septiembre de 1973
        O-67-411

652

*A. Torres Braschi,* abogado de los recurrentes; *Baker & Woods, Gilberto Mayo Aguayo,* abogados de los recurridos.

EL JUEZ ASOCIADO SEÑOR IRIZARRY YUNQUÉ emitió la opinión del Tribunal.

El 21 de abril de 1964 la sociedad legal de gananciales compuesta por los cónyuges Gerald y Catherine Boyd compró a los esposos Charles y Mildred Mihulka un solar y casa residencial localizados en la Urbanización Extensión Club Manor en Sabana Llana, Río Piedras. Los esposos Boyd pagaron el precio acordado de $44,000. Compraron dicha propiedad con el propósito de utilizarla para su vivienda, a cuyo mismo fin la habían dedicado los cónyuges vendedores.

Debido a que no había alcantarillado sanitario en el área la propiedad se servía de un sistema de pozos—séptico y filtrante—para la disposición de sus desperdicios y aguas negras. Por razón de que el terreno no filtraba, el sistema de pozos resultaba inoperante, y los vendedores, para remediar la situación, conectaron una tubería que descargaba a la calle las aguas negras del pozo filtrante. Los esposos Boyd no fueron advertidos de esta condición por los vendedores ni pudieron notar su existencia. No eran peritos que pudieran percatarse fácilmente de ella por razón de su oficio o profesión. Adquirieron la propiedad desconociendo dicha situación.

Con posterioridad a la fecha de adquisición el Sr. Boyd fue citado por agentes del Departamento de Salud debido a que-

jas presentadas por vecinos de predios a niveles inferiores a quienes afectaba el discurrir de las aguas negras descargadas. a la calle, provenientes de la casa del matrimonio Boyd. Fue mediante dicha citación que se enteró el Sr. Boyd de la condición existente. Trató de corregir la situación desconectando el tubo que recogía las aguas negras. Como consecuencia, debido a la impermeabilidad del terreno, las aguas no filtraron y se desbordaron, inundando su solar.

Se realizaron pruebas que comprobaron la impermeabilidad del suelo. Se determinó por peritos en la materia que, teóricamente, situaciones como ésta se corrigen, (1) excavando hasta encontrar en el subsuelo una capa filtrante ó, (2) estableciendo un sistema de tubería bajo el terreno que haga desembocar las aguas en una corriente natural. En este caso, ninguna de dichas soluciones era factible. La primera resultaba económicamente prohibitiva. La segunda resultaba imposible debido a la ausencia en el área de alguna corriente natural de agua.

Los esposos Boyd radicaron demanda ante el Tribunal Superior, Sala de San Juan, el 8 de octubre de 1964, en que reclamaron de los vendedores la devolución de la cantidad de $6,000, que alegaron era la diferencia entre el precio pagado por ellos y el valor razonable en el mercado de la propiedad una vez conocido el defecto o vicio de que adolecía. Alegaron que: "Tales defectos, los cuales ignoraban los compradores a la fecha de otorgar la escritura y los cuales eran imposibles de determinar, por no ser los demandantes peritos en la materia, hacen la cosa vendida prácticamente impropia para el uso a que se le destina y disminuye de tal modo ese uso que de haberlo conocido los compradores habrían pagado un precio menor por ella." [1]

Los demandados negaron el alegado defecto o vicio oculto y la consiguiente reclamación de los demandantes y fue el

---

[1] Aseveración número 11 de la demanda.

caso a juicio. La parte demandante presentó prueba pericial para justificar que la propiedad comprada por Boyd a Mihulka, conocido el problema para la disposición de aguas negras y con motivo de ello, debía tener a la fecha de su adquisición por Boyd un valor en el mercado de $33,600. Dicha prueba fue objetada oportunamente por los demandados, por el fundamento de que descansaba en testimonio de referencia. El tribunal de instancia la admitió y basándose en ella concluyó que los vendedores debían devolver a los compradores $10,400, que es la diferencia entre el precio pagado por éstos de $44,000, sin conocer el defecto, y el valor de la propiedad en el mercado—$33,600—una vez conocido el defecto. Dictó sentencia condenando a los demandados a pagar $10,400 a los demandantes, más costas y $1,000 de honorarios de abogado. Los demandados solicitaron auto de revisión.

Estando pendiente la transcripción de la prueba para fines del recurso de revisión, los demandantes-recurridos vendieron la propiedad en $46,000. Enterados de ello, los demandados-recurrentes radicaron ante el tribunal a quo una moción bajo la Regla 49.2 de Procedimiento Civil; [2] solicitando ser relevados de la sentencia dictada. Alegaron que, no obstante la opinión de los peritos, "el tal vicio oculto no afectó el valor en el mercado de la propiedad ni fue impedimento para que los demandantes realizaran un beneficio de $2,000, sobre el precio pagado por ellos." [3] Solicitaron de nosotros permiso para que el tribunal de instancia considerara dicha moción. Accedimos. Celebrada una vista y oída nuevamente prueba pericial, el

---

[2] Dicha regla permite al tribunal sentenciador "relevar a una parte o a su representante legal de una sentencia, orden o procedimiento," en varias situaciones que enumera. Dicha enumeración no es limitativa pues en la número (6) dice: "Cualquier otra razón que justifique la concesión de un remedio contra los efectos de una sentencia." Ciertamente el hecho acaecido con posterioridad a la sentencia—la venta de la propiedad—justificaba que bajo esta regla se reabriese el caso a la consideración del tribunal de instancia.

[3] Párrafo número 4 de la moción de la parte demandada solicitando ser relevada de la sentencia.

tribunal a quo dictó resolución negándose a dejar sin efecto ni modificar su sentencia. Los demandados solicitaron auto de *certiorari* para revisar dicha resolución. Así las cosas, expedidos tanto el auto de revisión como el de *certiorari*, decidimos consolidar ambos recursos. Dispondremos de ellos como si fueran uno solo.

La acción ejercitada por los demandantes-recurridos tiene por bases los Arts. 1373, 1374 y 1375 del Código Civil, 31 L.P.R.A. secs. 3841, 3842 y 3843, que respectivamente disponen:

Art. 1373 (31 L.P.R.A. sec. 3841)

"El vendedor estará obligado al saneamiento por los defectos ocultos que tuviere la cosa vendida, si la hacen impropia para el uso a que se la destina, o si disminuyen de tal modo este uso que de haberlos conocido el comprador, no la habría adquirido, o habría dado menos precio por ella; pero no será responsable de los defectos manifiestos o que estuvieren a la vista, ni tampoco de los que no lo estén, si el comprador es un perito que por razón de su oficio o profesión, debía fácilmente conocerlos."

Art. 1374 (31 L.P.R.A. sec. 3842)

"El vendedor responde al comprador del saneamiento por los vicios o defectos ocultos en la cosa vendida aunque los ignorase.

Esta disposición no regirá cuando se haya estipulado lo contrario, y el vendedor ignorara los vicios o defectos ocultos de lo vendido."

Art. 1375 (31 L.P.R.A. sec. 3843)

"En los casos de las dos secciones anteriores, el comprador podrá optar entre desistir del contrato, abonándosele los gastos que pagó, o rebajar una cantidad proporcional del precio, a juicio de peritos.

Si el vendedor conocía los vicios o defectos ocultos de la cosa vendida y no los manifestó al comprador, tendrá éste la misma opción y además se le indemnizará de los daños y perjuicios, si optare por la rescisión."

■ Como puede verse, el Art. 1375 da al comprador el derecho de optar entre la acción redhibitoria y la acción estimatoria. Por la primera puede deshacer la venta, recobrando lo que pagó. Por la segunda, conocida también como la acción

*quanti minoris*, la venta subsiste pero el comprador recobra parte del precio entregado. Scaevola([4]) señala que la acción estimatoria se define más propiamente como el "derecho del comprador para pedir que le sea restituida aquella parte del precio que pagó indebidamente, dada la disminución del valor de la cosa que suponen los vicios advertidos en ella." Si bien la acción que surge de los vicios redhibitorios se aplicó en un principio en Roma a las ventas de animales, se generalizó en el proceso evolutivo histórico para aplicarse a las ventas de inmuebles.([5]) Por analogía, se aplica a inmuebles la acción estimatoria o *quanti minoris*. Así lo habíamos dado por sentado en *Schlüter* v. *Aboy Vidal & Co., Inc.*, 49 D.P.R. 766 (1936) y en *D'Azizi* v. *Alcaraz*, 40 D.P.R. 915 (1930). La parte demandante optó por la pretensión estimatoria.

Como fundamentos de su recurso de revisión la parte demandada argumenta que el tribunal sentenciador cometió seis errores. Los tres primeros se refieren a la admisibilidad y valor probatorio de la prueba pericial presentada por los cónyuges demandantes. El cuarto y el quinto impugnan la

---

([4]) Scaevola, *Código Civil*, ed. 1970, tomo XXIII, pág. 203.

([5]) Dice Don José Castán Tobeñas, *Derecho Civil Español, Común y Foral*, octava edición, tomo IV, a la pág. 107:

"B. *Origen histórico.*—La responsabilidad por vicios ocultos no existía en el primitivo Derecho romano si los contratantes no la establecían expresamente por medio de un contrato verbal, agregado a la *mancipatio* o a la estipulación del doble hecha para el caso de evicción. Los ediles curules, encargados de la policía de los mercados tuvieron que proteger a los compradores de animales y esclavos, que eran con frecuencia víctimas del fraude, y a este efecto impusieron, en su Edicto, a los vendedores la obligación de manifestar los defectos de la cosa, y concedieron a los compradores, para el caso de que no se declarasen, la acción *redhibitoria* (para la resolución del contrato) y la acción *quanti minoris* o *estimatoria* (para obtener una reducción del precio). Estas acciones, nacidas para proteger las ventas hechas en los mercados, se hicieron extensivas más tarde—sin que pueda precisarse en qué época—a todas las ventas. Lo cierto es que en tiempo de Justiniano la generalización estaba hecha, y la doctrina ha pasado, con pocas modificaciones sustanciales, al Derecho moderno."

Véase, igualmente, Manresa, *Comentarios al Código Civil*, quinta ed., tomo X, pág. 249.

existencia de un vicio oculto como base de la acción ejercitada. El último ataca la imposición de honorarios de abogado.

■ Veamos en primer lugar los planteamientos respecto de la existencia del vicio oculto. Señalan los recurrentes que "la impermeabilidad del terreno, por ser una condición natural del mismo, no constituye un vicio oculto sujeto a saneamiento y de serlo, no es de tal naturaleza que justifique la reducción en el precio concedida." (6) Evidentemente parten de la base de que aquellos defectos de la cosa debidos a causa naturales no pueden calificarse de vicios ocultos. Ninguna autoridad citan en apoyo de esta afirmación. Tampoco la hemos encontrado nosotros. Es que el precepto de ley es claro. El citado Art. 1373, *supra*, hace obligatorio el saneamiento por el vendedor "por los defectos ocultos que tuviere la cosa vendida," sin distinguir entre aquellos defectos que sean naturales y los que le provengan por acción u omisión del hombre. De hecho, si recordamos que tanto la acción redhibitoria como la estimatoria se aplicaron en su origen a la venta de animales, forzoso es concluir que se refiriese tanto a vicios naturales como a los que no lo eran. Es más fácil concebir vicios naturales en un animal que vicios desarrollados por consecuencia de actos del hombre.

Castán (7) distingue entre vicios *jurídicos*, que consisten en una grave limitación al *derecho* trasmitido, como el caso de la servidumbre no aparente, y vicios *de hecho*, cuando se trata de defectos intrínsecos a la cosa vendida. A renglón seguido señala: "Los últimos son los que reciben, en sentido estricto, la denominación de vicios *ocultos* o vicios *redhibitorios* (de *redhibiere*, devolver), porque pueden deshacer la venta."

Definiendo lo que es "vicio" a los fines de la acción que nos ocupa señala Enneccerus: (8)

---

(6) Cuarto apuntamiento de error.

(7) *Op. cit.*, tomo IV, pág. 106.

(8) Ludwig Enneccerus, *Tratado de Derecho Civil*, ed. Bosch (Barcelona), 1966, tomo II, primera parte, págs. 88–89.

"Por 'vicio' ha de entenderse una diferencia desfavorable para el comprador con relación a la condición normal de la cosa. Ahora bien, la condición normal de la cosa no ha de determinarse únicamente de una manera abstracta, o sea con arreglo a los usos que corrientemente se hacen de tales cosas, sino que además se ha de tener en cuenta el uso previsto 'según el contrato'. Se exige, pues, una desviación desfavorable para el comprador de la aptitud que normalmente ha de esperarse para el uso corriente o para el uso previsto en el contrato. El concepto de vicio debe, pues, definirse *subjetiva* y *objetivamente.*"

■ La definición, tanto objetiva como subjetivamente, del vicio oculto está patente en el Art. 1373 antes transcrito. Señala, por un lado, que los defectos pueden ser de tal naturaleza que la cosa vendida se haga "impropia para el uso a que se la destina." Por otro lado, dicho artículo hace depender la obligación de saneamiento de que los defectos disminuyan de tal modo el uso de la cosa "que de haberlos conocido el comprador, no la habría adquirido, o habría dado menos precio por ella."

■ En uno u otro caso, conforme señala Castán, ([9]) se precisa que el vicio reúna las siguientes condiciones: (a) ser oculto o encubierto; (b) desconocido del comprador; (c) nocivo a la utilidad de la cosa, y (d) anterior a la venta, cuando menos en su germen o principio. Está implícito en la condición (c) que el defecto debe ser grave, es decir, que haga que la cosa sea impropia para el uso a que está destinada o disminuya su uso en forma tal que el comprador no la habría comprado o habría pagado menos por ella, de haberlo conocido. Véase *Ferrer* v. *General Motors Corp.,* 100 D.P.R. 246 (1971).

En su demanda los demandantes-recurridos señalaron que el defecto de la propiedad la hacía impropia para el uso a que estaba destinada. Alegaron también la disminución en su valor de modo tal que de haber conocido el defecto habrían

---

([9])*Op. cit.,* tomo IV, pág. 106.

pagado un precio menor por ella. Quizás podría ser objeto de discusión si en este caso la deficiencia en el desagüe hacía impropio el uso de la casa para fines de vivienda, que fue el propósito para el que la adquirieron los demandantes. Pero no puede haber dudas sobre la gravedad de dicha condición y la magnitud de la perturbación que ello necesariamente producía en el uso y disfrute de la vivienda como tal. No puede negarse justificación a la posición asumida por los demandantes de que de haber conocido el defecto habrían pagado un precio menor por la propiedad. Están aquí presentes todas las condiciones que definen la existencia del vicio redhibitorio o estimatorio y no erró el tribunal de instancia al así concluirlo.

Véase, por vía de comparación, la Sentencia de 10 de junio de 1952 del Tribunal Supremo de España, ([10]) que admitió como vicios que dan lugar a la acción estimatoria, entre otros, aquellos defectos "que afectan principalmente la solidez y duración del inmueble por su defectuosa construcción, a sus *condiciones de higiene*, utilización de los servicios de calefacción y *desagüe* y a la más elemental condición que debe tener toda vivienda de que no penetren en ella las aguas pluviales." (Énfasis suplido.)

Pasamos ahora a los alegados errores referentes a la prueba pericial. Debemos señalar que en la etapa del juicio estuvo justificado el tribunal de instancia en admitir prueba pericial para poder hacer una justa determinación sobre la cantidad proporcional del precio que los vendedores debían devolver a los compradores. Lo autoriza expresamente el Art. 1375 del Código Civil, antes transcrito. A tales efectos, se expresa así el profesor Ramón Badenes Gasset: ([11])

"Para esta reducción o rebaja del precio el precepto se remite al juicio de peritos, quienes deberán fijar la proporción

---

([10]) Véase Scaevola, obra citada, tomo XXIII, págs. 205–206.
([11]) Badenes Gasset, *El Contrato de Compraventa,* ed. Tecnos, Madrid, 1969, tomo I, pág. 715.

entre el valor real de la cosa al tiempo de la venta y el valor que hubiera tenido la cosa en estado sano. Es decir, el efecto de la acción estimatoria es la devolución de aquella parte del precio que el comprador pagó indebidamente, dada la disminución del valor de la cosa que suponen los vicios advertidos en ella. La proporción se establece en relación con la disminución del uso de la cosa, a fin de que, apreciado debidamente el valor utilitario de la misma, el comprador pague por ella lo que en realidad corresponda en cada caso particular, y no resulte lesionado por el contrato."

■ Esto no quiere decir que el "juicio de peritos" sea la manera, con exclusividad de otras, de determinar la disminución en el valor de la cosa, o dicho de otro modo, lo que el vendedor debe devolver al comprador. Aparte de lo preceptuado por el citado Art. 1375, *supra*, se justificaba en este caso el uso de prueba pericial porque en la etapa del juicio no había otro criterio que el dictamen de peritos para estimar el menoscabo en el valor de la propiedad. Pero si existe un medio más objetivo y cierto y menos especulativo, debe ser preferido al de determinación pericial. Así parece convenir Scaevola ([12]) cuando dice:

"Importa, de todas maneras, fijar bien el sentido de la referencia que hace el artículo 1.486 [1375 nuestro] al 'juicio de peritos'. En primer lugar para nada se necesitará de este medio cuando las partes se convengan. Sólo de no convenirse procederá la vía judicial, y sólo de entrarse en ella habrá lugar a la prueba de peritos. Pero entonces, ni la intervención de éstos constituirá un juicio, sino sólo un dictamen, pues otra cosa sería atentatoria de los más señalados principios del Derecho procesal, ni quedará limitado el libre arbitrio del Juez. Por consecuencia, aun no habiendo reparado los peritos en el extremo de que queda hecho mención, deber será del Juez tenerlo en cuenta, dentro de su derecho a la apreciación integral de las pruebas practicadas."

Cuando, con posterioridad a haberse dictado sentencia, accedimos a que el tribunal de instancia considerara la moción

---

([12]) *Op. cit.*, tomo XXIII, pág. 204.

de los demandados-recurrentes invocando la Regla 49.2 de Procedimiento Civil, tuvo dicho tribunal la oportunidad de aquilatar la verdadera merma en el valor de la propiedad, o pérdida para la parte demandante, independientemente de opiniones periciales. Dentro de ese incidente, a nuestro juicio, quedó claramente establecido mediante una simple operación aritmética que la pérdida fue de no más de $6,000. Veamos. En el precio de $46,000 obtenido por los recurridos Boyd al vender su propiedad *pendente lite* está comprendida la cantidad de $8,000 que representa su inversión en financiamiento y mejoras, que deducidos dejan un precio real de $38,000 el cual resulta ser $6,000 más bajo que lo por ellos pagado originalmente a sus vendedores Mihulka.

Habida cuenta del resultado a que hemos llegado mediante la susodicha operación matemática no es necesario considerar la adecuación del método utilizado por el perito de los compradores—conocido por capitalización de rentas—para determinar el valor en el mercado de la propiedad para un comprador conocedor del defecto señalado. En su consecuencia no tenemos que resolver si el testimonio del perito era objetable por estar basado en información obtenida fuera de corte proveniente de compradores potenciales. Cabe señalar, sin embargo, que en casos de esta naturaleza no puede exigirse una estricta aplicación de la regla sobre prueba de referencia. Sería contrario a la economía procesal exigir que todas las personas entrevistadas por un perito tasador para indagar sobre el valor de mercado de una propiedad tuvieran que comparecer como testigos antes de permitir una opinión del perito basada en la información obtenida por ellos. En este sentido, la opinión podría admitirse bajo el mismo razonamiento que admite la prueba de reputación. Más que la cuestión sobre admisibilidad del testimonio del perito debe pesar la consideración de su credibilidad. Véanse *Pueblo* v. *Ocean Park Development,* 73 D.P.R. 360 (1952).; *Colón* v. *Shell Co.* *(P.R.)* *Ltd.,* 55 D.P.R. 592 (1939) y *Costas* v. *G. Llinás & Co.,* 66 D.P.R. 730 (1946).

No obstante que en este caso el valor de la prueba pericial cede ante el criterio objetivo y cierto del precio de venta de la propiedad, es interesante notar que en opinión de su perito, la pérdida real y efectivamente sufrida por los compradores, aplicando el hecho conocido de la venta por $46,000 al valor que la propiedad debía tener en el mercado a la fecha de dicha venta si no hubiese tenido el defecto, fue de $6,500. Esta cifra dista muy poco de la cantidad que señalan los cómputos aritméticos, basados en la diferencia entre el costo total y el precio de venta de la propiedad. (13) Una vez recibida la prueba sobre la venta de la propiedad hecha con posterioridad al fallo cuya solicitud de revisión estaba pendiente, incidió el tribunal recurrido en su resolución negándose a modificar su sentencia.

■ En cuanto al apuntamiento que impugna la concesión de $1,000 para honorarios de abogado, no tienen razón los demandados-recurrentes. Su temeridad fue manifiesta al negar la existencia del defecto, no obstante conocerlo. La condena en honorarios de abogado es imperativa contra la parte perdidosa que ha sido temeraria. *Montañez Cruz* v. *Metropolitan Cons. Corp.*, 87 D.P.R. 38 (1962); *Ortiz* v. *Martorell*, 80 D.P.R. 544 (1958); *Vélez* v. *Ríos*, 76 D.P.R. 860 (1954). En cuanto a su cuantía, sabido es que corresponde a la facultad discrecional del tribunal sentenciador. *San Miguel Fertil. Corp.* v. *P. R. Drydock*, 94 D.P.R. 424, 442 (1967); *Géigel* v. *Ramos*, 79 D.P.R. 862 (1957); *Martín* v. *Torres*, 79 D.P.R. 391 (1956).

*Se dictará sentencia rebajando a $6,000 la cantidad que los demandados-recurrentes deben devolver a los demandan-*

---

(13) Por coincidencia, aunque el tribunal a quo concedió $10,400 a los demandantes, en su demanda solo reclamaron $6,000. No habiéndose objetado el testimonio pericial sobre la base de exceder su determinación de lo reclamado, pudo quedar enmendada la demanda por dicha prueba. Regla 13.2 de Procedimiento Civil. *Valle* v. *Sucn. Wiscovitch*, 88 D.P.R. 86 (1963); *Piovanetti* v. *Vivaldi*, 80 D.P.R. 108 (1957); *Betancourt* v. *U.S. Fidelity & Guaranty Co.*, 78 D.P.R. 650 (1955) y *D'Azizi* v. *Alcaraz*, supra.

*tes-recurridos por concepto de la merma en el valor de la propiedad, y así modificada la sentencia del tribunal a quo, será confirmada.*

El Juez Asociado, Señor Martín, concurre en el resultado sin opinión.