# 2009 DTA 91

**TRIBUNAL DE APELACIONES**
**REGIÓN JUDICIAL DE HUMACAO**
**PANEL V**

SAMUEL MONTAÑEZ FLORES Y OTROS
Demandantes-Apelados

v.

FAIRWAY COURTS REGIME Y OTROS
Demandados-Apelantes

Núm. KLAN-2008-00113

San Juan, Puerto Rico, a 17 de junio de 2009

Panel integrado por su Presidente, el Juez Arbona Lago,
la Juez Cotto Vives y el Juez Salas Soler

Cotto Vives, Jueza Ponente

## TEXTO COMPLETO DE LA SENTENCIA

Fairway Courts Regime, *et al.* nos solicitan que revoquemos una sentencia emitida por el Tribunal de Primera Instancia, Sala Superior de Humacao, el 16 de noviembre de 2007. En ésta, se declaró con lugar una demanda por incumplimiento de contrato y daños y perjuicios presentada por el señor Samuel Montañez Flores contra los apelantes y se desestimó la reconvención que éstos presentaron contra el apelado.

Inconforme, Fairway Courts Regime aduce que el Tribunal de Primera Instancia incidió al apreciar la prueba que le fue presentada y determinar que las obras que le fueron contratadas al señor Montañez Flores fueron completadas. Además, señala que el foro apelado se equivocó al conceder una indemnización por concepto de daños que no se alegaron, ni se demostraron, durante el juicio. Finalmente, aduce que no procedía la imposición del pago de honorarios de abogados por temeridad.

Efectuado el análisis de los asuntos que nos han sido planteados y, de conformidad con los fundamentos que expondremos a continuación, revocamos la sentencia apelada y, remitimos el caso al tribunal *a quo* para que continúe con los trámites en el mismo de forma compatible con lo que aquí disponemos.

## I

Examinemos los hechos. El 22 de abril de 2003, el señor Montañez Flores suscribió con Fairway Courts Regime un contrato mediante el cual se obligó a pintar los edificios que componen el complejo de viviendas Fairway Courts de la comunidad Palmas del Mar en Humacao. Conforme a los términos del acuerdo, el señor Montañez Flores debía lavar a presión el área a ser pintada, aplicar una capa de "Primer" en dicha área *y luego aplicarle, como mínimo, dos capas de pintura*. En la sexta cláusula del referido contrato se estableció que los $99,507.50 pactados como precio por las labores del apelado se pagarían por etapas, a saber:

"1. Etapa I - $19,901.40 — Al inicio de la obra

2. Etapa II - $9,950.75 — Al finalizar los primeros dos edificios.

3. Etapa III - $19,901.40 — Al finalizar los edificios 3, 4 y 5.

4. Etapa IV - $19,901.40 — Al finalizar los edificios 6, 7 y 8 y la verja.

5. Etapa V - $19,901.40 — Al finalizar los edificios 9 y 10, la caseta del guardia y los buzones.

6. Etapa VI - $9,951.15 — Al corregir todos los señalamientos y desperfectos que encuentre el inspector de la obra."

Véanse, págs. 169-170 del Apéndice del Recurso de Apelación.

Además, se estableció que el Ing. Matthias Erismann -propietario de una de las unidades de vivienda del complejo y, a su vez, miembro de la Junta de Directores de éste-, inspeccionaría periódicamente los trabajos con el fin de ir certificando la conclusión de cada una de las etapas en que se realizarían las obras. Según el

testimonio del apelado en el juicio, el señor Montañez Flores tramitaba dicha inspección de la siguiente forma: una vez concluía el lavado a presión de las paredes de los edificios, se comunicaba con el Ing. Erismann para que éste le diera el visto bueno para aplicar el "primer" y luego de aplicado dicho producto, llamaba nuevamente al ingeniero para que le autorizara la aplicación de la pintura. Una vez finalizados los trabajos en cada etapa, el ingeniero volvía a inspeccionarlos y refería la factura del apelado a la Junta de Directores para el pago correspondiente.

Cuando el Ing. Erismann determinó que las labores de pintura estaban bastante adelantadas, tramitó el pago de la mitad de los $9,951.15 correspondientes al importe de la sexta etapa de proyecto. Mientras tanto, el señor Montañez Flores —como parte de la quinta etapa de las obras contratadas—, realizó las labores de lavado a presión y aplicación de "primer" en los edificios 6, 7 y 8 del complejo, así como la caseta de seguridad y los buzones. Luego de obtener el visto bueno del Ing. Erismann, procedió a aplicar la pintura en dichas áreas. Cuando el apelado culminó dichas labores, se comunicó nuevamente con el ingeniero para que éste le diera el visto bueno al trabajo de pintura y se le pagara el importe correspondiente a la quinta fase del proyecto.

En esa ocasión, el señor Montañez Flores también solicitó el pago de la otra mitad de la sexta y última fase del contrato. Éste, según el texto del acuerdo, se entregaría al contratista *una vez se corrigieran todos los desperfectos o señalamientos que el Ing. Erismann hiciera después de realizar la inspección final de los trabajos*. La señora Sheila Camacho, Administradora de Fairway Courts, le remitió al apelado una lista de los defectos en la pintura encontrados por los residentes del complejo para que éstos fuesen corregidos antes de desembolsarse el pago final.

El señor Montañez Flores corrigió dichos defectos y los apelantes procedieron a realizar otra inspección de las estructuras, luego de la cual se señalaron más deficiencias en los trabajos, las cuales fueron referidas al apelado para su corrección. No obstante, a pesar de haberse comprometido con el Ing. Erismann para terminar esos arreglos y que le fuera remitido el pago de la quinta etapa, el señor Montañez Flores abandonó el proyecto. Véanse, págs. 231-232 de la T.P.O.

El apelado realizó con Fairway Courts Regime varias gestiones para el cobro de los $24,876.98 que aún se le adeudaban. Sin embargo, la apelante se negó a realizar dicho pago y le informó a que contrataría un perito químico para determinar si en la quinta fase del proyecto se le habían aplicado a las estructuras las dos capas de pintura que, como mínimo, requería el contrato suscrito entre las partes.

El 29 de abril de 2004, el señor Montañez Flores presentó una demanda por incumplimiento de contrato y daños y perjuicios contra Fairway Courts Regimes, entre otros. Adujo que la demandada se negaba irrazonablemente a efectuar el pago total de las últimas dos etapas de las obras de pintura del referido complejo de viviendas. Ello, señaló, provocó que la demandada perdiera contratos con otros clientes por falta de liquidez para comenzarlos y dañó el buen nombre y la reputación del demandante en la industria. El apelado reclamó el pago de los $24,876.98 que aún se le adeudaban en virtud del contrato, más $50,000 por concepto de daños.

El 8 de junio de 2004, Fairway Court Regime contestó la demanda y alegó la defensa de *exceptio non adimpleti contractus*. Argumentó que el demandante también había incumplido el contrato suscrito entre las partes al realizar defectuosamente los trabajos de pintura para los cuales fue contratado. Señaló que el señor Montañez Flores no aplicó las capas de "primer" y pintura requeridas en el acuerdo entre éstos, ni cumplió con las especificaciones establecidas en éste con relación a los productos que serían utilizados. Además, reconvino y alegó que el incumplimiento del demandante con el contrato de obras le provocó daños económicos estimados en $50,000.

Luego de varios trámites procesales —entre ellos, la presentación por parte de Fairway Courts Regime de una moción de sentencia sumaria que fue declarada sin lugar por el tribunal apelado—, se celebró el juicio los

días 26 de agosto, 21 y 22 de diciembre de 2006, 19 y 20 de marzo y 28 y 29 de junio de 2007. Como testigos del apelado declararon el señor Omar Santos Santos, Supervisor de Proyectos de la empresa Valcor-Samcor, los señores Víctor M. Nazario González y Jayson Serrano, ambos empleados de la empresa Sherwin-Williams, así como el propio demandante. Por parte de los demandados testificaron la señora Beatriz Sosa Velasco, Gerente de Proyectos Comerciales de Valcor-Samcor, el Ing. Matthias Erismann, el señor Joel Gómez Arias, vendedor de Sherwin-Williams, el señor Agustín Ruiz, perito químico y la señora Sheila Camacho González, administradora de Fairway Courts.

El 16 de noviembre de 2007, el Tribunal de Primera Instancia declaró con lugar la demanda presentada por el señor Montañez Flores y desestimó la reconvención de la parte demandada. El referido foro concluyó que el apelado había completado sustancialmente y conforme a los términos del contrato las obras de pintura. Además, señaló que la negativa de Fairway Courts Regime a pagar lo adeudado por las etapas V y VI del proyecto le ocasionaron al demandante daños económicos estimados en $25,000. Además, condenó a la parte apelante al pago de $5,000 por concepto de honorarios de abogado por temeridad.

## II

Los contratos son una de las fuentes de las obligaciones en Puerto Rico. Art. 1042 del Código Civil, 31 L.P.R.A. sec. 2992. En Puerto Rico rige el principio de libertad de contratación según el cual los contratantes pueden establecer los pactos, cláusulas y condiciones que tengan por convenientes, siempre que no sean contrarios a las leyes, a la moral, ni al orden público. Art. 1207 del Código Civil, 31 L.P.R.A. sec. 3372. Una vez median los elementos de consentimiento, objeto y causa necesarios para la existencia de un contrato, éste se convierte en la ley que rige entre las partes. Arts. 1044 y 1213 del Código Civil, 31 L.P.R.A. secs. 2994 y 3391.

En específico, el contrato de arrendamiento de obra es un contrato de trabajo de carácter consensual, bilateral y oneroso. Mediante éste, una de las partes se encarga de hacer una cosa para la otra a cambio de un precio convenido entre ellos. El dueño de la obra es el encargado de pagar el precio en la forma, cuantía y tiempo convenido. De no haber pacto o costumbre en contrario, el pago deberá hacerse al momento de la entrega de la obra. *Master Concrete Corp. v. Fraya, S.E.,* 152 D.P.R. 616 (2000); Art. 1490 del Código Civil, 31 L.P.R.A. sec. 4132. *Por su parte, el contratista viene obligado a ejecutar la obra conforme a lo convenido en el contrato, a las reglas del arte de la construcción y a los usos o reglas profesionales. Master Concrete Corp. v. Fraya, S.E., supra.*

La naturaleza del contrato de obras a precio alzado fue objeto de análisis por el Tribunal Supremo en el caso de *Crufon Const. v. Aut. Edif. Púbs.,* 156 D.P.R. 197 (2002). Allí, expresó que el contrato de obra a precio alzado consiste en señalar un monto por la totalidad de la ejecución de la obra, asumiendo el contratista los riesgos de la operación. *De este modo, el empresario se obliga a hacer entrega de la obra, realizada de conformidad con un proyecto técnico previamente acordado por los contratantes, por un precio global también fijado previamente.*

En el caso ante nos, Fairway Courts Regime señala que el tribunal *a quo* evaluó incorrectamente la evidencia que tuvo ante sí. Aduce que la prueba desfilada en el juicio demostró que el apelado incumplió el contrato de obras a precio alzado suscrito entre las partes. Según los apelantes, el señor Montañez Flores no aplicó de acuerdo a las reglas y la costumbre del arte de la construcción la pintura en los edificios del referido complejo, lo cual resultó en un trabajo mal hecho. El señor Montañez Flores, por su parte, señala que completó las referidas obras conforme a las especificaciones del contrato y que a pesar de ello Fairway Courts Regime se negaba a efectuar el pago acordado.

Hemos analizado la totalidad del expediente ante este Tribunal y, luego de evaluar, tanto la prueba documental como la testifical -mediante el examen de la transcripción de la prueba oral desfilada ante el tribunal apelado-, resolvemos que tanto el señor Montañez Flores, como Fairway Courts Regime, incumplieron

**196**

el acuerdo suscrito entre las partes. Veamos.

En primer lugar, es necesario clarificar que de la prueba surge que el señor Montañez Flores no se obligó con la demandada a realizar un mero "repintado" de las estructuras que componen el complejo de viviendas Fairway Courts, *sino que se comprometió, entre otras cosas, a cambiar por completo el color de los edificios.* Aunque este hecho no surge del contrato, **el propio demandante admitió durante su declaración en el juicio que a pesar de haber contratado un "repintado", lo que haría realmente sería un cambio total de colores.** El demandante aceptó durante su testimonio que aunque realizar dicho cambio resultaría más caro y difícil que el "repintado", aceptó el trabajo porque quería "entrar a Palmas del Mar" con el objetivo de lograr más contratos y procesar más trabajo para su empresa. Véanse, págs. 114-117 de la T.P.O.

Ahora bien, la tercera cláusula del acuerdo suscrito entre las partes disponía lo siguiente:

"---TRES:-La obra objeto del presente contrato incluye lo siguiente:------------------------

-1. Sellado de las paredes exteriores de concreto, albañilería y plástico mediante una capa de Loxon Acrylic Masonery Primer AZ4W300 y dos capas de Dura-Craft Exterior 100% Acrylic Flat B2 Series, **siguiendo las recomendaciones del manufacturero Sherwin Williams.**--------------

-2. . . .

-3. *El número de capas antes descrito es un número mínimo, puesto que el número requerido dependerá de las condiciones de la superficie y las especificaciones arquitectónicas.*—" (Énfasis suplido.)

Véase, pág. 167 del Apéndice del recurso.

Debemos recordar la norma de interpretación contractual que dispone que si los términos de un contrato son claros y no dejan duda sobre la intención de los contratantes, se estará al sentido literal de sus cláusulas. Art. 1233 del Código Civil, 31 L.P.R.A. sec. 3471. Conforme al texto anteriormente citado y tomando en consideración que el apelado debía *cambiar el color* de los edificios de Fairway Courts, es razonable inferir que el trabajo de pintura en dicho complejo *requeriría dos o más capas de pintura.* Enfatizamos el hecho de que la pintura nueva *debía cubrir adecuadamente el color viejo de las paredes de dichas estructuras,* de modo que el trabajo quedara bien hecho y la pintura no se apreciara translúcida y veteada. En cuanto a este aspecto, el propio apelado declaró que en algunas áreas del complejo *se tuvieron que aplicar hasta cuatro capas de pintura* para que el nuevo color quedara aplicado de manera uniforme. Véase, pág. 9 de la T.P.O.

Del testimonio de varias de las personas que declararon en el juicio se desprende que al menos en los edificios que comprendían la quinta fase del proyecto —los edificios 6, 7 y 8—, la pintura no se aplicó conforme a las reglas y la costumbre del arte de la construcción. A estos efectos, la señora Camacho González declaró que aunque ella no podía determinar cuántas capas de pintura se le habían aplicado al complejo, sí pudo apreciar a simple vista que en los últimos tres o cuatro edificios que se pintaron existían múltiples irregularidades en la aplicación de la pintura de las ventanas, pasillos, balcones y puertas. Véase, pág. 34 de la T.P.O.

Por su parte, el Ing. Erismann testificó lo siguiente:

"P Bien. Entonces, ¿qué pasó con los últimos dos (2) edificios de la etapa cinco (5)?

R Bueno, esa etapa fue la última etapa, los últimos dos edificios, y él no entregó una factura para cobrar eso. Y cuando yo voy a inspeccionar, entonces, esos edificios no estaban terminados. Y yo no pude recomendar ese

pago. Y se . . . Y no se autorizó porque no había terminado. Y no era solamente de que faltaban unos chivitos, no. Ahí faltaba mucho. Había paredes sin pintar, había la pérgola sin pintar, había rejas sin pintar. Había demasiadas deficiencias para aceptar que esos dos edificios estaban terminados."

Más adelante:

"HONORABLE JUEZ FLORES: ¿Y había unas que solamente tenía el *primer*?

TESTIGO: Sí. Algunos plafones que no estaban ni pintados, ni pintados. Y en la orilla se, veía que él — él aplicó la pintura, entonces la esquina de arriba todavía se veía la pintura vieja, que — no hizo la terminación. Algunas pérgolas no estaban pintadas. Algunas rejas no estaban pintadas. Había mucha deficiencia de residente, que son, pero cartas, escritos entregados a la . . .".

Véanse, págs. 106 y 133 de la T.P.O.

El señor Montañez Flores alega que unos trabajos de sellado que se realizaban en el complejo de forma paralela a las obras de pintura dañaron su labor. Sin embargo, éste no demostró por preponderancia de prueba el hecho de que *todos* los defectos en la pintura de dichas estructuras fueron provocados por dichos trabajos. Esta contención se apoya sólo en el testimonio del apelado, que declaró haber visto empleados de la compañía de sellado de techos removiendo con "thinner" algunas manchas de brea en la paredes de los edificios. No obstante, el propio señor Montañez Flores había declarado que el orden en que se pintaban los edificios tuvo que ser alterado, *de forma que se terminara el proceso de sellado antes de pintar las estructuras.* Véanse, págs. 19-20 de la T.P.O.

En fin, de la evidencia que tuvo ante sí el tribunal *a quo* puede inferirse razonablemente que en varios de los edificios de Fairway Courts las obras de pintura no fueron realizadas conforme a los estándares de calidad que se exigen razonablemente en la industria de la construcción. De la prueba desfilada puede apreciarse que los numerosos defectos que presenta la pintura de los edificios 6, 7 y 8 del referido complejo no pudieron haber sido provocados *únicamente* por los trabajos de sellado en los techos de dichas estructuras, como alega el apelado. Por ejemplo, el hecho de que **varias de las pérgolas y rejas del complejo se dejaran de pintar,** entre otras cosas, no puede atribuírsele a los referidos trabajos.

En cuanto a este aspecto, destacamos que es norma reiterada en nuestro ordenamiento jurídico que un foro apelativo no intervendrá con las determinaciones de hechos o la apreciación de la prueba realizada por el foro de instancia. Claro está, salvo que exista pasión, prejuicio, error manifiesto o parcialidad por parte de dicho foro, o que la apreciación de la prueba se aleje de la realidad fáctica, o ésta sea inherentemente imposible o increíble. *S.L.G. Rodríguez v. Nationwide,* 156 D.P.R. 614 (2002); *Belk v. Martínez,* 146 D.P.R. 215 (1998); *Méndez v. Morales,* 142 D.P.R. 26 (1996).

Por esa razón, el Tribunal Supremo ha desarrollado una norma de autolimitación que dispone que las determinaciones de hechos del tribunal de origen deberán ser respetadas y no podrán ser descartadas arbitrariamente, ni sustituidas por el criterio del tribunal apelativo, *a menos que éstas carezcan de fundamento suficiente en la prueba presentada. Méndez v. Morales, supra; Pueblo v. Maisonave Rodríguez,* 129 D.P.R. 49 (1991). Ello, en vista de que los foros recurridos están en una mejor posición para apreciar la prueba que los apelativos, ya que aquilatan la credibilidad de los testimonios, por razón de que pueden ver y escuchar los testigos mientras prestan testimonio. *S.L.G. Rodríguez v. Nationwide, supra; Pueblo v. Maisonave Rodríguez, supra.*

Ahora bien, a pesar de que esta función de los tribunales de primera instancia merece gran deferencia, *ello no presupone que las determinaciones de hechos de dicho foro estén exentas de error.* Por esta razón, en <u>Rivera</u>

*Pérez v. Cruz Corchado,* 119 D.P.R. 8 (1987), el Tribunal Supremo expuso que una apreciación errónea de la prueba no tiene credenciales de inmunidad frente a la función revisora del Tribunal. Así, reiteramos que aunque haya evidencia que sostenga las determinaciones de hechos del Tribunal de Primera Instancia, *el foro apelativo intervendrá con las mismas, si de un análisis de la totalidad de la evidencia, se convence de que se ha cometido un error, por estar éstas en conflicto con el balance más racional, justiciero y jurídico de la totalidad de la prueba presentada y admitida en evidencia. Méndez v. Morales, supra.*

En el caso de autos, aun cuando ciertamente el Tribunal de Primera Instancia tenía la facultad de aquilatar la prueba según la credibilidad que ésta le mereció, *no podía descartar evidencia presentada, no controvertida y capaz de crear duda en una mente razonable sobre el incumplimiento del señor Montañez Flores con el contrato en cuestión. Esta prueba ameritaba ser considerada junto con toda la demás evidencia presentada por las partes.* Ésta, reiteramos, era indicativa de que el señor Montañez Flores *también había incurrido en incumplimiento del contrato de obras suscrito entre las partes.* Luego del análisis de la totalidad de la prueba que tuvo ante sí el tribunal apelado, debía concluirse que en el presente caso *ambas partes* incumplieron con el mencionado acuerdo.

Todo vendedor está obligado a la entrega y saneamiento de la cosa vendida. Art. 1350 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 3801. Este deber de saneamiento le garantiza al comprador que el vendedor responderá de la posesión legal y pacífica de la cosa comprada *y de los vicios o defectos ocultos que tuviere.* Art. 1363 del Código Civil, 31 L.P.R.A. sec. 3831. En casos de saneamiento por vicios ocultos, el Código Civil dispone que el comprador puede optar entre desistir del contrato, abonándose los gastos pagados; *o reducir el precio en una cantidad proporcional, a juicio de peritos.* Art. 1375 del Código Civil, 31 L.P.R.A. sec. 3843.

La primera opción, denominada acción redhibitoria, representa la restitución *in integrum,* ya que coloca a las partes en la misma condición en la que se hallaban antes de la compraventa. *Boyd v. Tribunal Superior,* 101 D.P.R. 651 (1973). La segunda, conocida como acción estimatoria, o *quanti minoris,* conlleva la restitución del precio percibido *en proporción a la pérdida de valor en la cosa, a consecuencia del defecto. Boyd v. Tribunal Superior, supra.* La magnitud del defecto que da lugar a una acción redhibitoria, no necesariamente debe ser una que imposibilite el uso de la cosa, *sino que basta conque merme notablemente su valor. D.A.C.O. v. Marcelino Mercury, Inc.,* 105 D.P.R. 80 (1976).

En vista de que se ha resuelto que la determinación sobre la magnitud del defecto en una acción redhibitoria es una cuestión de hecho, es el Tribunal de Primera Instancia el foro que está en mejor posición para hacer esta apreciación. *Polanco v. Cacique Motors,* 165 D.P.R. 156 (2005). En consecuencia, remitimos el presente caso al foro de primera instancia para que **determine el valor de los defectos que presentan las obras de pintura del complejo Fairway Courts** y, luego de así hacerlo, determine los derechos y responsabilidades entre las partes.

En resumen, el tribunal *a quo* incidió al determinar que las obras que le fueron contratadas al señor Montañez Flores fueron completadas según los términos del contrato de obras entre las partes. Si bien es cierto que Fairway Courts violó su parte de dicho acuerdo, al pretender que el apelado reparara aquellas partes de la pintura que fueron dañadas por la brea sin pagar compensación adicional alguna —ello, en violación a la cláusula quince del contrato de obras—, no es menos cierto que existían otros defectos producto del trabajo del propio apelado que éste sí estaba obligado a corregir. En vista de ello, resolvemos que los primeros dos errores que se señalan en el recurso fueron cometidos.

Como tercer error, Fairway Courts aduce que el foro apelado se equivocó al conceder una indemnización por concepto de daños que no se alegaron, ni se demostraron, durante el juicio. El señor Montañez Flores alegó en su demanda que la negativa de los apelantes de pagarle las sumas adeudadas había provocado que su empresa estuviese expuesta a ser demandada, que perdiera contratos con otros clientes y viera su reputación y

buen nombre afectados negativamente. Además, alegó que había sufrido daños económicos y contratiempos en cubrir sus necesidades básicas. Todo ello, con un valor aproximado de $50,000.

En cuanto a este aspecto, es preciso señalar que el Art. 1061 del Código Civil, 31 L.P.R.A. sec. 3025, dispone que cuando una obligación consistiere en el pago de una cantidad de dinero y el deudor incurriere en mora, la indemnización de daños y perjuicios —no habiendo pacto en contrario—, consistirá en el pago de los intereses convenidos y, a falta de convenio, en el interés legal. Por tanto, en este caso no procedía imponerle a Fairway Courts Regime el pago de una indemnización de $25,000 por su demora en realizar el pago reclamado por el apelado. En segundo lugar, de todas maneras surge del récord que el señor Montañez Flores no probó durante el juicio los daños alegados y reclamados en su demanda. Veamos.

El señor Montañez Flores alegó que su empresa había perdido contratos como consecuencia de la escasez de liquidez ocasionada por la falta de pago de Fairway Courts. En específico, señaló que perdió un proyecto en Palmas del Mar porque no tenía dinero para pagar la póliza de seguro del Fondo del Seguro del Estado que se le requería como contratista. No obstante, esta contención fue refutada por el testimonio de la señora Beatriz Sosa Velasco. Durante su testimonio, ésta señaló que había tenido que retirar al señor Montañez Flores de los proyectos Flamboyán y Costa Verde en Palmar del Mar porque la calidad de su trabajo había decaído y se comprometía a acudir a los proyectos, pero luego no iba. Véase, págs. 35 y 58 de la T.P.O.

A esos efectos, la señora Sosa Velasco testificó lo siguiente:

"TESTIGO: No, es que la póliza del Fondo no es la razón por la que yo no le doy el contrato a Samuel. Eso no es la razón. Es porque él no podía manejar otro proyecto más del que estaba manejando, por lo mismo que le estaba expresando ahorita, ellos cogen muchos proyectos y no los supervisan. Y, entonces, después resulta en un problema de calidad. Y, pues eso es bien fácil, y después a los seis (6) meses aparecen los problemas de las filtraciones, de esas situaciones, que . . . .".

Véase, pág. 60 de ls T.P.O.

Es decir, el apelado no demostró por preponderancia de la prueba que la falta de pago por parte de Fairway Courts agravó su situación económica. Por el contrario, la prueba tiende a indicar que a pesar de que Fairway Courts ya había desembolsado casi el 75% del precio de las obras de pintura, Sherwin-Williams tuvo que, incluso, entregarle materiales a nombre de otro proyecto porque el señor Montañez Flores había agotado su línea de crédito en dicha empresa y se había quedado sin capital. Véase, págs. 136-142 de la T.P.O.

Finalmente, como último error, la apelante alega que no procedía la imposición del pago de honorarios de abogados por temeridad. Este error también se cometió.

La Regla 44.1 de Procedimiento Civil, 32 L.P.R.A. Ap. III, R. 44.1, establece lo referente a los honorarios de abogado. Esa regla dispone en su inciso (d), que "en caso que cualquier parte o su abogado haya procedido con temeridad o frivolidad, el tribunal deberá imponerle en su sentencia al responsable el pago de una suma por concepto de honorarios de abogado que el tribunal entienda que correspondan a tal conducta". De ahí que la imposición de honorarios es imperativa, una vez el tribunal ha determinado la existencia de temeridad. *Blás v. Hosp. Guadalupe,* 146 D.P.R. 267 (1998).

El concepto de temeridad no está expresamente definido en la Regla. 44.1(d), *supra,* pero el Tribunal Supremo lo ha definido ampliamente en la jurisprudencia y ha señalado que, en términos generales, se considera temeraria toda aquella conducta que haga necesario un pleito que se pudo evitar, que lo prolongue innecesariamente o requiera a la otra parte efectuar gestiones innecesarias. *Blás v. Hosp. Guadalupe, supra.*

El propósito de la imposición de honorarios de abogado en casos de temeridad es establecer una penalidad a un litigante perdidoso que por su terquedad, obstinación, contumacia e insistencia en una actitud desprovista de fundamentos, obliga a la otra parte, innecesariamente a asumir las molestias, gastos, trabajo e inconveniencias de un pleito. *Blás v. Hosp. Guadalupe, supra.* Además, la imposición de honorarios de abogado, así como la de interés presentencia, tiene como propósito disuadir la litigación innecesaria y alentar las transacciones mediante la imposición de sanciones a la parte temeraria para compensar los perjuicios económicos y las molestias sufridas por la otra parte. *Blás v. Hosp. Guadalupe, supra.*

El Tribunal Supremo ha resumido las instancias bajo las cuales existe temeridad, a saber: (1) contestar una demanda y negar responsabilidad total, aunque se acepte posteriormente; (2) defenderse injustificadamente de la acción; (3) creer que la cantidad reclamada es exagerada y que sea ésa la única razón que se tiene para oponerse a las peticiones del demandante sin admitir francamente su responsabilidad, pudiendo limitar la controversia a la fijación de la cuantía a ser concedida; (4) *arriesgarse a litigar un caso del que se desprendía prima facie su responsabilidad;* y (5) negar un hecho que le conste es cierto a quien hace la alegación. *Blás v. Hosp. Guadalupe, supra.*

En este caso, no hallamos indicio de que Fairway Courts haya incurrido en conducta temeraria al defenderse de las imputaciones hechas por el señor Montañez Flores en su demanda. En todo momento dicha parte fue consistente en sus alegaciones, con respecto a que no le había pagado al apelado la totalidad del precio establecido en el contrato debido a que el apelado realizó las obras de pintura de forma deficiente y que para corregirlas tenía que incurrir en gastos adicionales.

De lo que aquí resolvemos, queda demostrado que la contención de la parte apelante tenía méritos, por lo que revocamos la sentencia apelada. En consecuencia, resolvemos que el incumplimiento de contrato en el caso de autos fue mutuo y no únicamente por parte de Fairway Courts. Ante ello, resolvemos que el cuarto error apuntado, se cometió. En consecuencia, no procedía la imposición de honorarios de abogados por temeridad contra Fairway Courts Regime.

Resumimos. El contrato de obras suscrito por Fairway Courts Regime y el señor Montañez Flores fue incumplido por ambas partes. Por tanto, procede que el foro de primera instancia atienda este asunto, según el análisis aquí efectuado. Además, debe quedar clara la improcedencia de la indemnización de $25,000 que fue impuesta por el TPI, así como de los honorarios de abogado antes indicados.

### III

Atendidos los fundamentos expuestos, revocamos la sentencia apelada y remitimos el caso al tribunal *a quo* para que adjudique los derechos de las partes de forma compatible con lo aquí resuelto.

Así lo ordenó y manda el Tribunal y lo certifica la Secretaria del Tribunal.

Dimarie Alicea Lozada
Secretaria del Tribunal de Apelaciones