TEXTO COMPLETO DE LA SENTENCIA
Se recurre de una Resolución del Departamento de Asuntos al Consumidor (D.A.C.O.) de 10 de julio de 2008, notificada y archivada en autos el 11 del mismo mes y año. Mediante la misma se declaró ha lugar la querella presentada por los recurridos, Francisco M. Mora Romero (Sr. Mora) e Isaías J. Mora Revuelta, contra los recurrentes Auto Summit, Inc. H/n/c Señorial Ford (Auto Summit) y Ford Motor Company (Ford). Confirmamos.
I
El 16 de mayo de 2006, el Sr. Mora adquirió de Auto Summit un vehículo Ford modelo F250 del 2006 (Vehículo) por la suma de $48,900.00. El Sr. Mora pagó $10,000 de pronto y financió el balance mediante contrato de arrendamiento financiero con Popular Auto Inc. (Popular) pagadero en sesenta mensualidades de $590.00 y un residual de $15,000.00.
*648 El Vehículo tenía una garantía “bumper to bumper” de la Ford de tres años o 36,000 millas, lo que ocurriera primero. Popular cedió el derecho de garantía al Sr. Mora y le obligó a presentar cualquier reclamación directamente al suplidor.
El 2 de octubre de 2006, el Sr. Mora llevó el Vehículo al centro de servicios autorizado por Ford, Centro Camiones (Centro Camiones), con un ruido en la suspensión en carretera irregular. No se encontró defecto. El Vehículo había recorrido 2,941 millas al efectuarse la reclamación y fue entregado el 6 de octubre con el mismo millaje. Se facturó al Sr. Mora $415.69.
El 3 de noviembre de 2006, el Vehículo fue llevado a Auto Summit porque la luz de “check engine” prendió. Se diagnosticó como causa de la condición el código P0299 (turbo under boost) y se encontró el ICP fuera de rango (voltaje) y se reemplazó. Además, se verificó el sistema nuevamente y se hizo prueba de carretera. El Vehículo había recorrido 3,483 millas al efectuar la reclamación y fue entregado el 6 de noviembre de 2006.
El 27 de noviembre de 2006, el Sr. Mora acudió a Centro Camiones porque la luz de “check engine ” se activó nuevamente. Se reprogramó el PCM (power control module). El Vehículo había recorrido 4,018 millas al efectuar la reclamación y fue entregado el 30 de noviembre de 2006 con 4,055 millas.
El 15 de diciembre de 2006, el Sr. Mora fue a Centro Camiones porque la luz de “check engine” se activó nuevamente y se escuchaba la unidad de inyección encendida por varios minutos después de apagarse el vehículo. Una junta y un sensor fueron reemplazados y se añadió un aditivo al sistema de combustible. El Vehículo había recorrido 4,496 millas al efectuar la reclamación y fue entregado el 21 de diciembre con 4,598 millas.
El 23 de enero de 2007, el Vehículo fue llevado a Centro Camiones porque la luz de “check engine” se activó nuevamente. Se identificó el código u0155 (“lost communication with instrument cluster control module, verify connectors one out of place, remove all things verify connector in high pressure pump area for leaks and found OK”). La causa de la activación de la luz fue por el “instrument panel access”. El Vehículo había recorrido 5,677 millas al efectuar la reclamación y fue entregado el 29 de enero de 2007 con 5,724 millas.
El 5 de febrero de 2007, el Sr. Mora reclamó a Centro Camiones por pérdida de aceite en el área de la transmisión, se cayó un tornillo mientras se conducía y el acondicionador de aire no echaba aire hacia el frente. No se encontró “leak” de aceite, todo estaba normal en el lugar de donde podía haberse caído el tornillo y se acomodó la manga del tiro de aire acondicionado. El Vehículo había recorrido de 6,066 millas al efectuar la reclamación y fue entregado el mismo día con 6,067 millas recorridas.
El 13 de julio de 2007, el Sr. Mora instaló en el Vehículo un equipo de música con amplificación. Posteriormente, recibió instrucciones del gerente de Centro Camiones que, cuando solicitara servicio en garantía, removiera el fusible del sistema de música para evitar que los mecánicos lo utilizaran.
El 28 de agosto de 2007, el Vehículo fue llevado a Centro Camiones porque se encendieron las luces de “TBC Fault”, “herramientas” y “check engine”, las revoluciones bajaban y subían, la transmisión daba golpes, zumbaba el diferencial, el Vehículo se aceleraba solo y había raido al' apagar la unidad. Se reemplazaron ambas baterías porque no aguantaban la carga y se reprogramó el PCM. El Vehículo había recorrido 18,380 millas al efectuar la reclamación y fue entregado el 10 de septiembre de 2007 con 18,413 millas.
El 18 de septiembre de 2007, el Sr. Mora fue a Centro Camiones porque la luz de “check engine” y las otras luces del panel de instrumentos se encendieron. Se atribuyó la condición a un pin abierto del conector C146. El Vehículo había recorrido 18,634 millas al efectuar la reclamación y fue entregado el 20 de septiembre de 2007 con el mismo millaje.
*649 El 30 de enero de 2008, se llevó el Vehículo a Centro Camiones porque las luces de “check engine” y la “llave de herramienta” se encendieron, el Vehículo botaba humo blanco en ocasiones, cuando iba corriendo le prendían las luces del panel de instrumentos (TBS, Abs; Check Engine, CT), daba cantazos en la transmisión cuando la unidad se aceleraba sola, cuando iba a 55 millas de momento comenzaba a vibrar y de momento se le quitaba la vibración y el cristal trasero no funcionaba. Se atribuyó la condición de las luces indicadoras a un modulo del “ABS” y las vibraciones a falta de rotación y balanceo de gomas, se pidió la pieza relacionada con el cristal, no se presentó la condición relacionada de no encender en frío y se relacionó el humo blanco al modulo del ABS que fue reemplazado. El Vehículo había recorrido 25,859 millas al efectuar la reclamación y fue entregado el 28 de febrero de 2008 con el mismo millaje.
El 12 de febrero de 2008, el Sr. Mora presentó una querella ante el D.A.C.O. Solicitando resolución del contrato de compraventa del Vehículo y daños.
El 6 de marzo de 2008, el Sr. Mora acudió a Centro Camiones indicando que en ocasiones los relojes dejaban de funcionar y prendían todas las luces del panel de instrumento, quedándose la unidad prendida o en marcha. Se verificó y el alternador tiraba carga baja de 12.52 voltios y la batería tenía un voltaje de 12.43. Se reemplazaron las dos baterías y el alternador.
Mientras el Vehículo estaba en Centro Camiones, el D.A.C.O. realizó una inspección del auto encontrando el cable y la maquinaria del cristal y la mica de la luz interior de la puerta izquierda trasera rotas. En la inspección no presentó la condición que indicaba el Sr. Mora de que cuando prendían las luces de “check engine” y del panel, la transmisión daba un cantazo cuando ponía los cambios. El Vehículo fue entregado el 30 de abril de 2008 con 26,159 millas. En la factura se consignó que “se verificó unidad y se encontró que equipo de música no es original; esto puede estar causando daños al sistema de carga; consume mucho voltaje; esta reparación es una de cortesía; no es garantía. "■
El 20 de mayo de 2008, el Sr. Mora reclamó a Centro Camiones que la luz indicadora de TBC se encendía, el panel se iba en blanco y luego prendían las luces de “check engine”, “Tool HLD” y la “llave en forma de herramienta”, vibración en el rodaje después de 60 millas y marcaba erróneamente la aguja indicadora de nivel de combustible diesel desde “empty” hasta “full”. El gerente de servicio le denegó garantía oralmente debido a que relacionaba el equipo de música con la condición reclamada. El Sr. Mora solicitó que se mantuviera la unidad en observación removiendo lo relacionado con el equipo de música, comprometiéndose a retener el Vehículo si ellos confirmaban que esa era la causa de la condición intermitente. El Vehículo fue entregado el 3 de junio de 2008. El personal técnico removió antes de la entrega un cable de la batería que suple el sistema de música de corriente.
El 16 de junio de 2008, el Vehículo presentó nuevamente la condición de encendido de “check engine” junto con la luz indicadora de la batería. La condición se manifestó en tres ocasiones. La primera de éstas fue a un viaje a Fajardo. La unidad tembló y le prendieron las luces. En la segunda ocasión, al ir de Centro Camiones al establecimiento comercial “Acha”, un trayecto menor de tres millas, el Vehículo prendió todas las luces del panel. La intermitencia de la condición ocasionó que el Vehículo se apagara mientras era conducido. El Sr. Mora estableció la consecuencia angustiosa de estar pagando el vehículo sin tener disponible el uso seguro del mismo.
El 18 de junio de 2008 se celebró la vista administrativa ante el Oficial Examinador del D.A.C.O. (Oficial Examinador). Ese día, luego de que las partes presentaran su prueba, el Oficial Examinador hizo una inspección del Vehículo en las facilidades de Centro Camiones en presencia de las partes. El Oficial Examinador indicó que el propósito era efectuar un diagnóstico con el “scanner” y obtener cualquier código de la memoria de la computadora, si alguno, que corroborara si la apreciación de los técnicos era correcta o si surgía un asunto distinto al efectuar el diagnóstico.
*650 Según surgió de la inspección, las condiciones del Vehículo en cuanto su apariencia y presentación eran excelentes. Se efectuó el diagnóstico y no se halló código alguno en la memoria. Como parte de dicho diagnóstico, se monitoreó y verificó el sistema de carga. Éste dio un voltaje de 12.88 voltios y en la pantalla del “scanner” monitoreaba las altas y bajas de voltaje desde 12.13 hasta 13.13 voltios, sin el equipo de música activado, pero con las luces, el acondicionador de aire y las luces de emergencia activadas. El resultado de esta intervención con el “scanner” se incluyó en un informe impreso de tres páginas.
Además, como parte de la verificación del diagnóstico se instaló el mismo analizador de batería “rotunda” que fue utilizado por el personal técnico de Auto Summit para llegar a su diagnóstico en las baterías del Vehículo. Aunque el analizador identificó carga de superficie (surface charge) sobre una de la baterías, el equipo no funcionó. Como alternativa, se instaló un voltímetro con un margen de error de +.01%. La lectura identificada en voltios fue: 12.68 con el vehículo apagado; las lecturas de voltios fueron aumentando de 12.68 hasta 13.47 con el motor en marcha; y las lecturas de voltaje descendieron de 13.44 hasta 12.80 al activarse los accesorios, excepto el equipo de música.
Por otra parte, se apagó el Vehículo e instaló el conector de suplido de corriente y fusible correspondientes al equipo de música. Se encendió el motor del Vehículo y se activaron los accesorios con el sistema de música a niveles de volumen que distorsionaban el sonido y eran intolerables. Se obtuvo una lectura de voltaje en voltios más baja de 12.67 y más alta de 12.84. Al acelerarse el vehículo, la lectura aumentó a 13.10 voltios.
Finalmente, el Oficial Examinador observó que cerca de la instalación de la batería próxima al chofer ubicada en el motor, había tres cables sueltos disponibles para la instalación de accesorios adicionales al Vehículo. Los recurrentes los identificaron e informaron que se habían instalado por el manufacturero.
Luego de evaluar la prueba presentada por las partes y el resultado de la inspección ocular, el D.A.C.O. Dictó la Resolución recurrida declarando ha lugar la querella y decretando la resolución del contrato de compraventa del Vehículo (Resolución). En consecuencia ordenó a Ford y Auto Summit reembolsarle al Sr. Mora lo que pagó de pronto pago, gastos de originación, licencia, mensualidades y relevarlo del contrato de arrendamiento financiero. Además, ordenó a Ford pagarle al Sr. Mora $4,090.00 por concepto de daños.
En la Resolución, el D.A.C.O. expresó que existían ocho fundamentos que sostenían su decisión. A estos fines indicó lo siguiente:

“A. Como primer punto tomado en consideración tenemos la hoja de servicio donde se consignó lo siguiente “Se verificó unidad y se encontró que (sic) equipo de música no es original (sic) esto puede estar causando daños (sic) al sistema de carga consume mucho voltaje (sic) esta reparación es una de cortesía no es garantía. ”

La frase utilizada “puede estar causando ” no cumple con el criterio de especificidad o rigurosidad requerido por el ordenamiento al Manufacturero, cuando le establece una obligación de otorgar cualquier remedio adecuado para corregir las fallas o defectos que presente los vehículos. Nos referimos a que mediante la garantía de fábrica, “el Manufacturero o fabricante afirma la idoneidad del diseño, materiales y mano de obra utilizados en la fabricación o ensamblaje de vehículos de motor y comprometiéndose al reembolso, reparación, sustitución o cualquier otro remedio adecuado para corregir las fallas defectos o deficiencias que dichos vehículos puedan presentar dentro de un período de tiempo determinado.” Ley de Garantías de Vehículos de Motor. 10 L.RR.A. 2052(b).
Cónsono con lo anterior, el Artículo 10 del Reglamento, supra, dispone lo siguiente:

“Artículo 10-Denegación de Servicio Bajo Garantía

*651
Cuando el fabricante, distribuidor o concesionario, vendedor de un vehículo de motor nuevo o usado, se niegue a honrar la garantía o alguna parte de ésta bajo el fundamento de que el consumidor incumplió las condiciones impuestas en la misma, deberá entregar a éste por escrito las razones específicas por las cuales entiende estar relevado de su obligación.

Ante una afirmación de idoneidad y una obligación de honrar la garantía, se requiere un grado de certidumbre sobre la causa del defecto para poder denegar una reparación en garantía. No se exime de responsabilidad el manufacturero al señalar sobre la existencia de un equipo u accesorio instalado que no es de fábrica. Está obligado a establecer un nexo causal entre el defecto reclamado y a la circunstancia que se le atribuye. Reconocemos que las sospechas son partes del análisis de diagnóstico útiles en el desarrollo de hipótesis, pero no son suficientes para establecer un nexo causal. Ante lo anterior, concluimos que la denegatoria de los servicios de reparación en garantía no cumple con el ordenamiento antes citado.

B.Como segundo punto tomado en consideración, fue el testimonio pericial de Magdiel Pérez cuando estableció para el registro que el parámetro de voltaje operacional del vehículo, sin luces y aire acondicionado activado, es de 13.74 a 14.50 voltios. Con los accesorios prendidos es 13.10 hasta 13.20 voltios.

Sin embargo, la prueba efectuada en la inspección ocular reflejó un voltaje de 12.88 con los accesorios prendidos sin el equipo de música activado, luego de haberse el personal técnico asegurado que el equipo de música no estaba operacional mientras estaba en observación. El expediente nos obliga a concluir que el auto no estaba dentro de los parámetros operacionales establecidos por el manufacturero en cuanto al voltaje, a pesar de que las medidas fueron tomadas para que el equipo de música no se usara. Ante la ausencia del uso del equipo de música, concluimos que el vehículo se encontró trabajando por debajo de los requerimientos del voltaje anteriormente especificados por el técnico. Todo ello debido a una causa distinta al uso del equipo de música.

C. El tercer punto tomado en consideración, fue que en la inspección ocular el voltímetro reflejo medidas de voltaje ascendentes cuando el auto se aceleró y los accesorios y equipos de música estaban activados. Se encendió el motor del vehículo activándose los accesorios con el sistema de música a niveles de volumen intolerables que distorsionaban el sonido. La lectura de voltaje más baja fue 12.67 y la más alta 12.84. Al acelerarse el vehículo aumentó hasta 13.10 voltios. La lectura identificada en voltios con el vehículo apagado fue 12.68. Con el motor en marcha, las lecturas de voltios fueron aumentando desde 12.68 hasta 13.47. Activando los accesorios exceptuando el equipo de música descendió las lecturas de voltaje desde 13.44 hasta 12.80. Sin embargo, el técnico Magdiel Pérez estableció en su testimonio que con el equipo de música funcionando aceleró a 1200 revoluciones por minuto (RPM) y a 4000 (RPM) para que el alternador compensara la falta de voltaje. Aún así, la lectura que obtuvo fue de 12.54 voltios.

Ante lo anterior, el expediente nos obliga a concluir que aún con el equipo de música activado en los parámetros antes descritos, el voltaje llegó a 13.10 por encima de la lectura obtenida de 12.88 sin él activado. Por consiguiente, el equipo aunque incide en el consumo de potencia de corriente del vehículo no es la causa eficiente de la condición defectuosa de naturaleza intermitente.

D. El cuarto punto tomado en consideración fue la ausencia de un protocolo de diagnóstico que estableciera un grado de certidumbre en la cantidad de unidades de corriente requeridas por el equipo de música, tomando en consideración la disponibilidad de unidades de corriente para el consumo de los componentes electrónicos relacionados con el motor y transmisión, para accesorios existentes en el vehículo, y la posibilidad de conectar accesorios adicionales. ”

La parte querellada baso su diagnóstico, en fluctuaciones de voltajes y sospechas sobre la ausencia de un fusible del quipo de música que el querellante retiraba por instrucciones del gerente de servicio anterior de Centro Camiones Inc.
*652 Cabe destacar que el término de voltaje se refiere a la corriente eléctrica bajo presión. Pero, cuando nos referimos a la unidad de medida para medir la cantidad de potencia de corriente eléctrica se utiliza el término “Coulumb". Nos referimos a cantidad de potencia de corriente en movimiento a la unidad de “Coulumb per second’. Cuando la corriente se traslada a la velocidad de “Coulumb por second’ equivale a un ampere. Véase, Wiring Simplified, HP Ritcher and WC Schwan, 35th Edition 1986, pág. 16. Traducción nuestra.
Nada en el expediente respalda que el diagnóstico incluyera un análisis de la cantidad de amperajes disponibles versus los consumidos por los componentes electrónicos del vehículo. Más elemental aún, ninguno de los técnicos estableció para el registro el requisito de amperaje del equipo de música y como su consumo afectaba el funcionamiento, a pesar que tuvieron posesión del mismo y lo activaron para medir el voltaje. Destacamos que el Sr. Edgardo Escobar fundamentó su opinión en la potencia de corriente necesaria para el equipo de música utilizando términos de amperaje y watts, sin establecer para el registro que proceso de medición utilizó para llegar a su conclusión y si intervino físicamente con el auto.
El expediente nos obliga a concluir que las aseveraciones y opiniones vertidas sobre el alegado consumo de los amplificadores y el equipo de música se basan en el conocimiento generalizado y teórico, pero no en el resultado de un proceso de medición del consumo de la potencia de la carga eléctrica del vehículo.

“E. El quinto punto tomado en consideración fue que las sospechas de los técnicos sobre el retiro de fusible por el querellante antes de solicitar servicio de reparación, se disipó en la vista administrativa al conocer que el querellante había recibido instrucciones sobre el particular del anterior gerente de servicio de Centro Camiones Inc. El testimonio del Técnico Magdiel Pérez estableció la existencia de la prohibición de los técnicos en activar el sistema de música de las unidades que estén reparando en Centro Camiones Inc. ”

Ambos testimonio se corroboran entre sí, obligándonos a concluir su veracidad y la ausencia de intención o conocimiento del querellante en “alegadamente” inducir a error a los técnicos de servicio en su diagnóstico.

“F. El sexto punto tomado en consideración fue la aseveración del Sr. Edgardo Escobar en establecer que la intervención de reparación sobre el módulo ICP no esta relacionada al sistema de carga. Sin embargo, no se determinó la causa para que éste se dañara. Cuando nos explicó su opinión para el registro estableció “si no tengo una carga adecuada van a surgir todas esas condiciones que tenemos. Que si..., que si la transmisión cambia errática porque la transmisión tiene sus módulos, inclusive el “boost” por el turbo alimentador por el ICP tampoco llega suficiente corriente, va tener una presión de “boost” en el turbo errática y ese tipo de cosa porque no tenemos una carga adecuada. En todos los vehículos modernos la carga es crítica. ”

Ante lo anterior, el expediente nos obliga a concluir que la determinación sobre la primera reparación de “ICP, no estar relacionada con el sistema de carga o no pudo haberse dañado por falta potencia eléctrica”, no esta respaldada con evidencia sustancial.

“G El séptimo punto tomado en consideración fue la intención constante por parte del querellante y su padre de que las coquerelladas tuvieran la oportunidad razonable de diagnosticar correctamente el vehículo. El expediente respalda que fueron 10 reclamaciones en total. Cinco antes de julio de 2007 y cinco posteriores. El expediente respalda el consentimiento manifiesto del querellante en el informe de inspección para que la unidad se reparara a pesar de haber radicado la presente querella, y de su padre de obligarse a retener la unidad en caso de la querellada determinara inequívocamente que la causa de la condición intermitente es causada por el uso del equipo de música.

H. El octavo punto tomado en consideración, fue la ausencia de una explicación técnica que relacionara la condición intermitente cuando la activación del radio o su uso no fue objeto parámetros. Nos referimos a que el radio fue activado en la inspección ocular a unos niveles de que el sonido se distorsionaba, y aún así, la 
*653
condición no se manifestó. Además, de haber sido correcta la determinación de los querellados, nunca se estableció cuánto tiempo el equipo de música tiene que estar accionado para que la condición se manifieste. ”

Conforme lo anterior, el D.A.C.O. determinó que los recurrentes no habían probado que la condición del Vehículo no era un defecto de fabricación. En este sentido, indicó lo siguiente:

“Todo lo anterior nos obliga en conceder credibilidad al querellante en su reclamación y reconocer la omisión por parte de Ford Motor Co. en establecer mediante evidencia sustancial que la condición no es un defecto de fabricación, diseño, ensamblaje o -manufactura. Sin embargo, no menospreciamos la participación de los técnicos peritos en el procedimiento. Su participación fue imprescindible para el análisis antes realizado. ”

El expediente respalda la existencia de una condición defectuosa intermitente. A pesar de las 10 intervenciones por parte del personal técnico de las querelladas, la condición ha resurgido obligándonos a concluir que las condiciones han sido remediadas temporeramente, pero no han sido reparadas de forma satisfactoria.
El expediente administrativo respalda la conclusión de inseguridad del querellante, aunque no es perito de tecnología automotriz, en cuanto al uso seguro del vehículo cuando se puede apagar en marcha. También respalda el expediente administrativo la falta de confiabilidad del querellante en el auto y en la capacidad técnica de los querellados para diagnosticar y reparar satisfactoriamente la condición defectuosa.
Inconformes, recurren Auto Summit y Ford. Señalan que se cometieron los siguientes errores:

“Primer Error: Erró DACO, como cuestión de derecho, al fundamentar su resolución en la opinión del juez administrativo, quien no es perito automotriz, y quien formuló su opinión durante una inspección ocular celebrada: sin abrir récord; sin informar el juez en ese momento a las querellas cuál era su opinión de forma que las querelladas pudiesen presentar prueba en contrario; sin dar oportunidad posterior a las querelladas de presentar prueba en contrario; y cuando la inspección fue llevada a cabo luego de que el Juez hubiese preguntado a las partes y dado por sometido el caso; todo ello en contravención con las más básicas normas de justicia sustancial y debido proceso.

Segundo Error: Erró DACO, como cuestión de derecho, al concluir que las querelladas fallaron en establecer mediante evidencia sustancial que la condición del vehículo no se debió a un defecto de fabricación, diseño, ensamblaje o manufactura, cuando esa conclusión es contraria a la evidencia sustancial en el record: (I) las hojas de reparación o Job Orders que evidencia que la condición surgió luego de instalado el equipo de música; y (2) el testimonio de los únicos dos peritos que testificaron en la vista que estableció que la condición fue causada por la instalación de un equipo de música que no es de fábrica, que no fue instalado por un representante del fabricante y que no fue autorizado por el fabricante.

Tercer Error: Erró DACO, como una cuestión de estricto derecho, al aplicar a un caso de saneamiento por vicios ocultos las disposiciones generales de contratos del Artículo 1077 del Código Civil en lugar de aplicar las disposiciones especiales de saneamiento por vicios ocultos. ”

La parte recurrida presentó su alegato. Resolvemos.
II
La norma establecida es que las decisiones de los organismos administrativos se presumen correctas y gozan de deferencia por los tribunales. Rivera Concepción v. A.R.P.E., 152 D.P.R. 116, 123 (2000). La facultad revisora de los tribunales de las decisiones administrativas incluye las siguientes áreas: (1) concesión del remedio apropiado; (2) revisión de las determinaciones de hechos conforme al criterio de evidencia sustancial; y (3) revisión de las conclusiones de derecho en su totalidad. T-JAC, Inc. v. Caguas Centrum Limited, 148 D.P.R. 70, *654 80-81 (1999).
“Las determinaciones de hechos de las decisiones de las agencias serán sostenidas por el tribunal, si se basan en evidencia sustancial que obra en el expediente administrativo. ” See. 4.5 de la Ley de Procedimiento Administrativo Uniforme (LPAU), según enmendada, 3 L.P.R.A. see. 2175. Sin embargo, “[l]as conclusiones de derecho serán revisadas en todos sus aspectos por el tribunal. ” Id.
El criterio rector en la revisión judicial de una determinación de hecho de una agencia es la existencia de evidencia sustancial en el expediente administrativo. A estos fines, se ha definido evidencia sustancial como “aquella evidencia pertinente que una mente razonable pueda aceptar como adecuada para sostener una conclusión”. Ramírez v. Depto. De Salud, 147 D.P.R. 901, 905 (1999). De ordinario, los tribunales no intervendrán en las determinaciones de hechos de las agencias, mientras exista evidencia sustancial en apoyo de las mismas. Pacheco v. Estancias, 160 D.P.R. 409, 432 (2003). Dicho análisis requiere que la evidencia sea considerada en su totalidad; esto es, tanto la que sostenga la decisión administrativa como la que menoscabe el peso que la agencia le haya conferido. Assoc. Ins. Agencies, Inc. v. Com. Seg. P.R., 144 D.P.R. 425, 437 (1997).
Para sostener la posición de que no existe evidencia sustancial que apoye las determinaciones de la agencia administrativa, la parte afectada debe demostrar que existe “otra prueba en el récord que razonablemente reduzca o menoscabe el peso de tal evidencia hasta el punto de que un tribunal no pueda, concienzudamente, concluir que la evidencia sea sustancial, en vista de la totalidad de la prueba presentada... y hasta el punto que se demuestre claramente que la decisión [de la agencia] ...no está justificada por una evaluación justa del peso de la prueba.” Hilton Hotels v. Junta Salario Mínimo, 74 D.P.R. 670, 686 (1953). La prueba ofrecida deberá desfavorecer la presunción de que la determinación del organismo administrativo se desprende de la totalidad de la prueba que éste tuvo ante su consideración. Véase, Ramírez, v. Depto. de Salud, 147 D.P.R., a las págs. 905-906.
Por otro lado, las garantías requeridas a los fabricantes y distribuidores de vehículos de motor en nuestra jurisdicción están reguladas por la Ley de Garantías de Vehículos de Motor, Ley Núm. 7 de 24 de septiembre de 1979 (Ley 7), 10 L.P.R.A. sees. 2051 y ss. El distribuidor autorizado es la persona que se dedica “a la venta al detal o distribución de vehículos de motor de cualquier marca por concesión y autorización o acuerdo con el fabricante o su representante de fábrica en Puerto Rico. ” Art. 2 (e), 10 L.P.R.A. see. 2053 (e).
Conforme la Ley 7, el distribuidor autorizado que vende a un consumidor un vehículo de motor nuevo viene obligado a prestar efectivamente los servicios de garantía de fábrica. Art. 11, 10 L.P.R.A. see. 2061. Las obligaciones y responsabilidades establecidas en la Ley 7 no relevan al fabricante, manufacturero, distribuidor o vendedor del vehículo de las responsabilidades legales establecidas en nuestro sistema de derecho. Art. 12, 10 L.P. R.A. see. 2062.
Además, la Ley 7 asigna al D.A.C.O. la responsabilidad de implantar la Ley y adoptar reglamentación en esta área. Art. 13, 10 L.P.R.A. see. 2063. Conforme esta facultad, el 30 de septiembre de 1992; el D.A.C.O. promulgó el Reglamento de Garantías de Vehículos de Motor, Reglamento Núm. 4797 (Reglamento). Véase, Rodríguez v. Overseas Military, 160 D.P.R. 270, 283 (2003). Este Reglamento fue sustituido por el Reglamento Núm. 7151 de 1 de junio de 2006. El propósito del Reglamento fue que constituyera un mecanismo para proteger adecuadamente a los consumidores de Puerto Rico en la adquisición de vehículos de motor; asegurarles que estos vehículos sirvieran los propósitos para los cuales fueron adquiridos; y que reunieran las condiciones necesarias para garantizar al comprador la protección de vida y propiedad. Regla 2 del Reglamento.
El Reglamento es aplicable a toda persona natural o jurídica que se dedique a la venta de vehículos de motor nuevos o usados en Puerto Rico. Regla 3 del Reglamento. El mismo debe interpretarse liberalmente a favor del consumidor. Regla 4 del Reglamento.
*655 La Regla 22 del Reglamento establece que el D.A.C.O. podrá, a opción del comprador, decretar la resolución dél contrato de venta de un vehículo de motor o reducir proporcionalmente su precio de venta de acuerdo con las disposiciones del Código Civil, en aquellos casos en que el vendedor, distribuidor ¿utorizado o concesionario, distribuidor de fábricas o fabricante, dentro de los términos de la garantía, tuvo oportunidad razonable para reparar uno o más defectos, pero no quiso o no pudo corregirlos. Además, esta disposición reglamentaria establece que el- D.A.C.O. determinará lo que constituye oportunidad razonable de reparar tomando en consideración las circunstancias particulares de cada caso.
Esta disposición es consistente con las responsabilidades impuestas bajo el Código Civil de Puerto Rico a los vendedores de bienes muebles. Pérez v. VPH Motors Corp., 152 D.P.R. 475, 488 (2000); Ford Motor Co. v. Benet, 106 D.P.R. 232, 238 (1977). Véase, además, Arts. 1054 y 1077 del Código Civil, 31 L.P.R.A. sees. 3018 y 3052.
La Regla 37 del Reglamento, sin embargo, aclara que las disposiciones del Reglamento no limitan el derecho del consumidor a ejercer cualquier otra acción que le conceda la ley, incluyendo acciones de saneamiento por vicios ocultos y la acción redhibitoria. Pérez v. VPH Motor Corp., 152 D.P.R., a la pág. 488. Ello es consistente con la doctrina adoptada por el Tribunal Supremo de Puerto Rico en el área contractual, que reconoce que los distintos remedios que provee la ley no son excluyentes, y que una persona agraviada puede ejercitar, de forma alternativa, cualquiera de las causas de acción que le ofrece el ordenamiento. Véase, Márquez v. Torres Campos, 111 D.P.R. 854, 866 (1982).
El Artículo 1373 del Código Civil, 31 L3P.R.A. see. 3841, en este sentido, dispone que el vendedor de un bien viene obligado al saneamiento por los defectos ocultos que tuviere la cosa vendida, si la hacen impropia para el uso a que se le destina o disminuyen este uso de tal modo que, de haberlo conocido el comprador, no la habría adquirido o habría dado menos precio por ella. Dicho precepto añade que el vendedor no será responsable por los defectos manifiestos o aquellos que estuvieren a la vista, ni tampoco de los que no lo estén, si el comprador es un perito que, por razón de su oficio o profesión, debía fácilmente conocerlos. Domínguez v. Caguas Expressway Motors, 148 D.P.R. 387, 396 (1999).
El comprador tiene la opción de desistir del contrato o de solicitar una rebaja en la cantidad del precio; Art. 1375 del Código Civil, 31 L.P.R.A. see. 3843; Boyd v. Tribunal Superior, 101 D.P.R. 651, 655-656 (1973).
En el caso de vehículos de motor, el Tribunal Supremo de Puerto Rico ha establecido que constituyen vicios redhibitorios o cuantiminosos aquellos defectos que excedan de las imperfecciones menores que cabe normalmente esperar en un producto de esta naturaleza. No es requisito que dichos defectos imposibiliten el uso de la cosa vendida, siempre que mermen notablemente su valor. Pérez v. VPH Motor Corp., 152 D.P.R., a las págs. 489-490.
Aunque el defecto ha de ser oculto al momento de la compraventa, el Tribunal Supremo ha aclarado que ésta es una cualidad relativa. No se trata de que el defecto quede oculto en sentido literal, sino que lo sea para el comprador atendiendo sus características individuales. Esto significa que no será responsable el vendedor por los vicios ocultos cuando el comprador sea un perito que debiera fácilmente conocer los defectos por razón de su ocupación u oficio. Polanco v. Cacique Motors, 165 D.P.R. _ (2005), 2005 J.T.S. 101, a la pág. 1486. Para establecer la existencia de un vicio oculto, por lo tanto, el comprador no tiene que demostrar específicamente cuál o cuáles piezas están defectuosas. Polanco v. Cacique Motors, 2005 J.T.S. 101, a la pág. 1487; García Viera v. Ciudad Chevrolet, Inc., 110 D.P.R. 158, 163 (1980).
Debe recordarse que, por lo general, el comprador de un vehículo de motor no es un perito en mecánica automotriz. Basta con que establezca que el vehículo no funcionaba con normalidad y que el vendedor tuvo la oportunidad de corregir los defectos y no lo hizo. Polanco v. Cacique Motors, 2005 J.T.S. 101, a la pág. 1487.
*656 La apreciación sobre la importancia de los defectos constituye una cuestión de hecho a ser dilucidada por el juzgador de primera instancia, que es quien está en mejor posición para hacer dicha determinación. Un tribunal apelativo no intervendrá con su discreción sobre este particular en ausencia de prueba adecuada o error manifiesto. Domínguez v. Caguas Expressway Motors, 148 D.P.R., a la pág. 397; D.A.C.O. v. Marcelino Mercury, Inc., 105 D.P.R. 80, 84-85 (1976).
De otra parte, es norma establecida que cuando uno de los contratantes en una obligación recíproca incumple con su parte del acuerdo, la parte perjudicada podrá exigir el cumplimiento del contrato o la resolución de la obligación y el resarcimiento de daños y pago de intereses. Art. 1077 del Código Civil, 31 L.P.R.A. see. 3052. El incumplimiento de una obligación recíproca conlleva efecto resolutorio, siempre que la obligación incumplida sea una esencial o que su cumplimento constituya el motivo del contrato para la otra parte. Neca Mortg. Corp. v. A&W Dev. S.E., 137 D.P.R. 860, 875 (1995).
Atenderemos en primer orden el segundo señalamiento de error de los recurrentes. Aducen que incidió el D. A.C.O. en la apreciación de la prueba al concluir que los recurrentes no probaron mediante evidencia sustancial que la condición del Vehículo no se debió a un defecto de fabricación, diseño, ensamblaje o manufactura, por lo que esa conclusión es contraria a la evidencia sustancial en el récord. Sostienen que demostraron que la condición surgió luego de que se instaló el equipo de música en el Vehículo y ésta fue la causa de la condición. Hemos considerado el recurso presentado, el alegato de la parte recurrida y sus anejos y no encontramos base para intervenir con la decisión del D.A.C.O.
Primeramente, como hemos indicado, el D.A.C.O. expresó en la Resolución ocho fundamentos para apoyar su dictamen. Entre éstos, se destacan que los recurrentes no establecieron la causa del defecto, el Vehículo no operaba dentro de los parámetros establecidos por el manufacturero en cuanto al voltaje y no se estableció cómo el uso del equipo de música afectaba el funcionamiento del sistema eléctrico del Vehículo y los recurrentes no refutan estas conclusiones.
Los recurrentes aseveran que la condición surgió luego de que el equipo de música se instaló en el Vehículo. Sin embargo, la prueba demostró que antes de dicha instalación se tuvo que reparar el módulo ICP (voltaje) y los recurrentes no probaron que dicha reparación no estuviera relacionada con el sistema de carga o no se dañara por falta de potencia eléctrica.
Es evidente que las determinaciones del D.A.C.O. sobre este asunto están razonablemente sostenidas por la prueba desfilada ante dicho foro, la que refleja que el vehículo del recurrido fue llevado al taller de servicio de Centro Camiones en innumerables ocasiones, sin que la causa del defecto en el automóvil hubiera sido determinada. Cabe presumir que Auto Summit tuvo una oportunidad razonable de llevar a cabo lo anterior. Por lo tanto, concluimos que el error no fue cometido.
En el tercer señalamiento de error, los recurrentes indican que incidió el D.A.C.O. al aplicar a un caso de saneamiento por vicios ocultos las disposiciones generales de contratos del Artículo 1077 del Código Civil y no las disposiciones de saneamiento por vicios ocultos y al conceder daños. No tienen razón.
Como hemos visto, en este caso, el D.A.C.O. ordenó la resolución de la venta y la devolución de las prestaciones y otorgó daños, remedios que están expresamente contemplados por la Regla 22 del Reglamento y el Artículo 1077 del Código Civil, 31 L.P.R.A. see. 3052. Además, contrario a lo que indican los recurrentes, en la Resolución se expresó que la condición intermitente que presentó el Vehículo recurrió, por lo que la agencia consideró que esta condición era grave e imposibilitaba el uso pleno y seguro del Vehículo, lo que, a su vez, constituía un vicio redhibitorio. Conforme lo anterior, el D.A.C.O. concedió el remedio que procedía en derecho y no se cometió el error apuntado.
*657 Por último, en el primer señalamiento de error, los recurrentes sostienen que el Juez Administrativo del D.A. C.O. (Juez Administrativo) realizó una inspección ocular del Vehículo luego de finalizado el desfile de prueba y tomó en consideración para su decisión el resultado.de unas pruebas que él realizó sin ser perito y sin darle oportunidad a los recurrentes de presentar evidencia para refutar tales pruebas.
Indican que la inspección ocular se dividió en dos fases. En cuanto a la primera fase señalan que se hizo un diagnóstico con un “scanner”, el cual confirmó que el Vehículo no tenía código alguno registrado en la memoria de la computadora. Sostienen que ello significa que el Sr. Mora mintió cuando declaró en la vista administrativa, porque él indicó que unos días antes las luces del panel del Vehículo prendieron, y el resultado del “scanner” reflejaba que no habían prendido dichas luces.
Los recurrentes añaden que en la segunda fase, el Juez Administrativo hizo otras pruebas ordenando a un mecánico de Centro Camiones instalar unos medidores de voltaje al Vehículo y obtuvo unas medidas que eran erróneas porque no recreaban las condiciones operacionales reales del Vehículo. Indican que tales pruebas se hicieron al Vehículo a altas revoluciones, lo que no sucede cuando éste es conducido en la carretera.
Los recurrentes alegan que lo anterior no podía considerarse para el dictamen de la agencia, por lo que éste debe ser revocado. El argumento de los recurrentes sólo es correcto parcialmente y no nos lleva a concluir que procede revocar la Resolución recurrida. Veamos.
Como se sabe, la inspección ocular es un medio de prueba que, en su discreción, el juzgador puede realizar para auxiliarse en la dilucidación de la controversia. Arts. 1169, 1194 y 1195 del Código Civil, 31 L.RR.A. sees. 3262, 3311 y 3312; Regla 81 de las de Evidencia, 32 L.P.R.A. Ap. IV, R. 81; Regla 134 de las de Procedimiento Criminal, 34 L.P.R.A. Ap. II, R. 134. Véase, además, R. Emmanuelli Jiménez, Prontuario de Derecho Probatorio, 2da Ed„ 2005, págs. 749-752.
Sin embargo, las partes en los procedimientos administrativos gozan, entre otros, del derecho a que la decisión esté basada en el expediente administrativo. Art. 3.1 de la LPAIJ, 3 L.P.R.A. see. 2151; Magriz v. Empresas Nativas, 143 D.P.R. 63, 70 (1997). Lo que esto significa es que el dictamen administrativo se base en la prueba y materias oficialmente admitidas en la vista, lo que se tomó conocimiento oficial y todo lo que sucedió en la vista. Comisionado v. A.E.E.L.A., 171 D.P.R. _ (2007), 2007 J.T.S. 118, a la pág. 1646. No puede adjudicarse la controversia a la luz de evidencia secreta que no ha sido notificada a las partes ni se ha brindado oportunidad de rebatirla. Torres Ramos v. Policía de P.R., 143 D.P.R. 783, 796 (1997); López y Otros v. Asoc. de Taxis de Cayey, 142 D.P.R. 109, 114-116 (1996).
Coincidimos con los recurrentes en que el Juez Administrativo incidió al tomar en consideración las pruebas que realizó en la segunda parte de la inspección ocular. Aunque estas pruebas se hicieron en presencia de las partes, éstas no tuvieron oportunidad de rebatirlas, lo que está vedado. Torres Ramos v. Policía de P.R., 143 D.P. R., a la pág. 796; López y Otros v. Asoc. de Taxis de Cayey, 142 D.P.R., a las págs. 114-116. Por lo tanto, la agencia no podía considerar el resultado de estas pruebas en su dictamen. Sin embargo, lo anterior no significa que deba alterarse el dictamen recurrido porque no fue un error perjudicial. Regla 4 de las de Evidencia, 32 L.P.R. A. Ap. IV, R. 4; Pueblo v. Ruiz Bosch, 127 D.P.R. 762, 782 (1991).
Según hemos indicado, en la primera fase de la inspección ocular, la cual no cuestionan los recurrentes, se efectuó un diagnóstico con un “scanner”. Aunque como bien indican los recurrentes, esa prueba confirmó que el Vehículo no tenía código alguno registrado en la memoria de la computadora, además, en ese diagnóstico el sistema de carga dio un voltaje de 12.88 voltios, sin el equipo de música activado, pero con los accesorios prendidos. Esto último fue utilizado como el segundo fundamento en la Resolución porque la prueba pericial de los recurrentes fue a los efectos de que el parámetro de voltaje operacional establecido por el manufacturero para el Vehículo era 13.10 a 13.20 voltios con los accesorios encendidos y el referido voltaje de 12.88 significaba que *658 el Vehículo estaba trabajando por debajo de lo establecido por el manufacturero.
Por otra parte, como octavo fundamento incluido en la Resolución fue “la ausencia de una explicación técnica que relacionara la condición intermitente cuando la activación del radio o su uso no fue objeto de parámetros”. Aunque para llegar a esta conclusión también se usó parte del resultado de las pruebas que el Juez Administrativo realizó en la segunda fase de la inspección ocular (“nos referimos a que el radio fue activado en la inspección ocular a unos niveles de que el sonido se distorsionaba, y aún así, la condición no se manifestó”), ello sólo fue uno de dos fundamento. A estos fines, en la Resolución se indicó como razón adicional para la referida conclusión que “de haber sido correcta la determinación de los querellados, nunca se estableció cuánto tiempo el equipo de música tiene que estar accionado para que la condición se manifieste
Por último, no podemos pasar por alto que también existen otros fundamentos en la Resolución recurrida que los recurrentes no discuten en su recurso. Al considerar dichos fundamentos, entendemos que de todos modos existe evidencia sustancial en el expediente administrativo para sostener la decisión de la agencia. Por lo tanto, en atención a sus conocimientos especializados en el asunto, procede confirmar la determinación de la agencia.
III
Por los fundamentos expresados, se dicta sentencia confirmando la Resolución recurrida.
Notifíquese.
Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal.
Leda. María Elena Pérez Ortiz Secretaria del Tribunal de apelaciones